**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-02172-RM-NYW

LINDSAY MINTER,
PASTOR THOMAS MAYES,
KRISTIN MALLORY,
TYLER SPRAGUE,
ALISSIA ACKER,
IRMA JOLENE FISHER, and
TOBIAS HOPP, on behalf of themselves, and others similarly situated,

       Plaintiffs,

v.

CITY OF AURORA, COLORADO,
INTERIM POLICE CHIEF VANESSA WILSON, in her official and individual capacities,
MAYOR MICHAEL COFFMAN, in his individual capacity,
STEPHEN REDFEARN, in his individual capacity,
DELBERT L. TISDALE, JR., in his individual capacity,
MICHAEL McCLELLAND, in his individual capacity,
TERRY BROWN, in his individual capacity,
REGINALD DePASS, in his individual capacity,
NATHANIEL MOSS, in his individual capacity,
STEPHEN T. GARBER, in his individual capacity,
DARREN CHAMBERLAND, in his individual capacity,
MATTHEW BRUKBACHER, in his individual capacity,
WILLIAM HUMMEL, in his individual capacity,
DANIEL SMICK, in his individual capacity,
JASON BUBNA, in his individual capacity,
AUSTIN RUNYON, in his individual capacity,
SAMMIE WICKS, II, in his individual capacity,
JOSHUA WINTERS, in his individual capacity,
KEVIN DEICHSEL, in his individual capacity,
RYAN SWEENEY, in his individual capacity,
JORDAN O'NEAL, in his individual capacity,
CALEB JOSEPH PARRELLA, in his individual capacity,
EDWARD L. VANCE, in his individual capacity,
NICHOLAS WILSON, in his individual capacity,
MICHAEL BENDER, in his individual capacity,
KATHRINE LEWIS, in her individual capacity,
DEJON MARSH, in his individual capacity,
ROBERT ROSEN, in his individual capacity,
RONALD JAUREGUI-GUTIERREZ, in his individual capacity,

HADEN JONSGAARD, in her individual capacity,
MATTHEW GREEN, in his individual capacity,
ETHAN SNOW, in his individual capacity,
BRIAN MCCLURE, in his individual capacity,
SCOTT OSGOOD, in his individual capacity,
RYAN STOLLER, in his individual capacity,
JUAN GONZALEZ, in his individual capacity,
JENNIFER MCCORMACK, in her individual capacity,
NICHOLAS BRUNGARDT, in his individual capacity,
JOSHUA BEBEE, in his individual capacity,
STEVEN BRENNEMAN, in his individual capacity,
NICHOLAS LESANSKY, in his individual capacity,
MATTHEW CAMPBELL, in his individual capacity,
CORY MANKIN, in his individual capacity,
GRETA SALAZAR, in her individual capacity,
JEANNETTE RODRIGUEZ, in her individual capacity,
ROBERT WEATHERSPOON, in his individual capacity,
TYLER TIEGEN, in his individual capacity,
SEAN CONLEY, in his individual capacity,
CHRISTOPHER (SHANE) PURCELL, in his individual capacity,
LEWIS LITWILER, in his individual capacity,
GREG BRYANT, in his individual capacity,
BEN BULLARD, in his individual capacity,
RYAN MCCONNELL, in his individual capacity
BRANDON HOLDER, in his individual capacity,
ANTHONY ROSALES, in his individual capacity,
GREG GOMPERT, in his individual capacity,
CARLY SIMMONS, in her individual capacity,

      Defendants.

---

## AMENDED COMPLAINT AND JURY DEMAND

---

      Plaintiffs, on behalf of themselves and others similarly situated, by and through their attorneys Mari Newman, Andy McNulty, and Helen Oh of KILLMER, LANE & NEWMAN, LLP, respectfully allege for their Amended Complaint and Jury Demand as follows:

### <u>INTRODUCTION</u>

1.     Aurora police and medics murdered Elijah McClain on August 24, 2019.

2.      Instead of accepting responsibility for brutally ending the life of any innocent young man, and acknowledging Elijah McClain's death as a long-overdue moment of reckoning for a city with a long history of racist policing, Aurora has circled the wagons, gas-lit its own residents by denying the obvious facts relating Elijah's murder, and shielded the officers and medics who murdered Elijah from any accountability whatsoever. Those who are newly awakened might wrongly think that Aurora's conduct is new and unusual, but Aurora has long been engaging in these tactics. Aurora has just now been exposed on the world stage.

3.      Aurora again resorted to bullying and violence during a violin vigil that was held on June 27, 2020, to honor Elijah and call for justice for his murder. Prior to the vigil, community leaders, including one of the named Plaintiffs, secured permission from the City of Aurora to hold a peaceful night of remembrance on the Aurora Municipal Center Great Lawn. Violinists flew in from across the country to participate in this peaceful celebration of the life of a young man so full love and empathy that he played violin to calm frightened and caged animals

as they waited to be adopted.



4.      Without any legal justification, the Aurora Police declared a completely peaceful

assembly "unlawful," and did so out of earshot of a large number of the vigil attendees.

5.      As hundreds of people gathered to listen to the musicians, Aurora directed a

coordinated force from the Aurora Police Department ("APD"), assisted by officers from the

Arapahoe and Jefferson County Sheriff's Offices ("ACSO" and "JCSO"), and the Adams

County Sheriff's Department ("ACSD") – clad in full riot gear – to march toward the peaceful

crowd in a totally unjustified show of intimidation.

6.      Against the backdrop of the violinists' beautiful and haunting soundtrack, these

officers under APD direction bullied and indiscriminately deployed chemical agents on the men,

women, and children who had gathered to peacefully remember Elijah. Some even wielded

batons and shot projectiles. Defendants' actions sent young children running in terror. They

caused asthmatics to grasp for their inhalers (while simultaneously gasping for breath). They

drove faith leaders and families to leave. They terrorized an already reeling and grieving community.

7.      Then, incredibly and in direct contradiction of *video* evidence, Aurora proceeded with its standard cover-up. Defendant Interim Chief of Police Wilson presented a sterile PowerPoint aimed at justifying the unconstitutional, and disgusting, actions of Aurora's officers and the other officers under her command. This presentation, however, only reinforced how grossly abusive Aurora's actions were at the vigil.

8.       This lawsuit seeks to vindicate the constitutional rights of the Aurora community that peacefully gathered to remember one of its own, who was killed by those whose job was to protect and serve.

## JURISDICTION AND VENUE

9.      This action arises under the Constitution and laws of the United States, and is brought pursuant to Title 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331. Jurisdiction supporting Plaintiffs' claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

10.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado.

11.     Supplemental pendent jurisdiction for Plaintiffs' state law claims is based on 28 U.S.C. § 1367 because the violations of federal law alleged are substantial and the pendent state law causes of action derive from a common nucleus of operative facts.

## PARTIES

12.     At all times pertinent to the subject matter of this litigation, Lindsay Minter was a citizen of the United States of America and a resident of and domiciled in the State of Colorado.

13.     At all times pertinent to the subject matter of this litigation, Pastor Thomas Mayes was a citizen of the United States of America and a resident of and domiciled in the State of Colorado.

14.     At all times pertinent to the subject matter of this litigation, Kristin Mallory was a citizen of the United States of America and a resident of and domiciled in the State of Colorado.

15.     At all times pertinent to the subject matter of this litigation, Tyler Sprague was a citizen of the United States of America and a resident of and domiciled in the State of Colorado.

16.     At all times pertinent to the subject matter of this litigation, Alissia Acker was a citizen of the United States of America and a resident of and domiciled in the State of Colorado.

17.     At all times pertinent to the subject matter of this litigation, Irma Jolene Fisher was a citizen of the United States of America and a resident of and domiciled in the State of Colorado.

18.     At all times pertinent to the subject matter of this litigation, Tobias Hopp was a citizen of the United States of America and a resident of and domiciled in the State of Colorado.

19.     Defendant City of Aurora, Colorado ("Aurora") is a Colorado municipal corporation.

20.     At all times pertinent to the subject matter of this litigation, Defendant Vanessa Wilson was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant Wilson was acting under color of state law in her capacity as Interim Police Chief of Aurora. Defendant Wilson was responsible for supervising Defendants with the attending officers from Aurora Police Department ("APD"), the Arapahoe County Sheriff's

Office ("ACSO"), the Adams County Sheriff's Department ("ACSD")[1] and Jefferson County Sheriff's Office ("JCSO) and directing their actions on June 27, 2020.

21.     At all times pertinent to the subject matter of this litigation, Defendant Michael Coffman was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant Coffman was acting under color of state law in his capacity as Mayor of Aurora.

22.     The moniker "Aurora Police Department Defendants" (or "APD Defendants"), in addition to Chief Wilson, refers to Defendants Stephen Redfearn, Delbert L. Tisdal, Jr., Michael McClelland, Terry Brown, Reginald DePass, Nathaniel Moss, Stephen T. Garber, Darren Chamberland, Matthew Brukbaker, William Hummel, Daniel Smick, Jason Bubna, Austin Runyon, Sammie Wicks, II, Joshua Winters, Kevin Deichsel, Ryan Sweeney, Jordan O'Neal, Caleb Joseph Parrella, Edward L. Vance, Nicholas Wilson, Kathrine Lewis, Dejon Marsh, Robert Rosen, Ronald Jauregui-Gtuierrez, Haden Jonsgaard, Matthew Green, Ethan Snow, Brian McClure, Scott Osgood, Ryan Stoller, Juan Gonzalez, Jennifer McCormack, Nicholas Brungardt, Joshua BeBee, Steven Brenneman, Nicholas Lesansky, Matthew Campbell, Cory Mankin, and Greta Salazar. At all times pertinent to the subject matter of this litigation Aurora Police Department Defendants were citizens of the United States and residents of and domiciled in Colorado. At all times pertinent Aurora Police Department Defendants were acting within the scope of their official duties and employment and under color of state law in their capacities as law enforcement officers employed by the APD.

---

[1] The information that has been provided by Adams County Sheriff's Department ("ACSD") to date indicates that ACSD personnel did not use force (through baton strikes or chemical agents) during the events of June 27, 2020. In reliance on this information, Plaintiffs have not brought claims against any ACSD officers. Should information become available demonstrating that this is not the case, Plaintiffs reserve the right add ACSD officers as defendants in this matter.

23.     The moniker "Arapahoe County Defendants" (or "ACSO Defendants"), refers to Defendants Jeannette Rodriguez, Robert Weatherspoon, Tyler Tiegen, Sean Conley, Christopher (Shane) Purcell, Lewis Litwiler, Greg Bryant, Ben Bullard, Ryan McConnell, and Brandon Holder. At all times pertinent to the subject matter of this litigation, Arapahoe County Defendants were citizens of the United States and residents of and domiciled in Colorado. At all times pertinent, Arapahoe County Defendants were acting within the scope of their official duties and employment and under color of state law in their capacities as law enforcement officers employed by the Arapahoe County Sheriff's Office ("ACSO"). These officers had been called into action based on Colorado's Mutual Aid Statute by the APD and were under the direction and control of APD and Defendant Wilson.

24.     The moniker "JCSO Defendants" refers to Defendants Anthony Rosales, Greg Gompert, and Carly Simmons. At all times pertinent to the subject matter of this litigation, the Jefferson County Defendants were citizens of the United States and residents of and domiciled in Colorado. At all times pertinent, Jefferson County Defendants were acting within the scope of their official duties and employment and under color of state law in their capacities as law enforcement officers employed by the Jefferson County Sheriff's Office ("JCSO"). These officers had been called into action based on Colorado's Mutual Aid Statute by the APD and were under the direction and control of APD and Defendant Wilson.

25.     The moniker "law enforcement officers" includes all of the Aurora Police Department Defendants, Jefferson County Defendants, and Arapahoe County Defendants.

## **FACTUAL ALLEGATIONS**

26.     On the evening of August 24, 2019, at approximately 10:30 p.m., 23-year-old African-American Elijah McClain became the latest victim of the APD's well-documented

penchant for racist violence. Though Elijah committed absolutely no crime, and the involved APD officers had no reason to believe that he did, they subjected him to a lengthy, torturous use of force. First, without any justification, the officers grabbed Elijah – who weighed only about 140 pounds and posed no threat to their safety or anyone else's – and then tackled him to the ground. Then for the next eighteen minutes – fifteen of which Elijah was laying on the ground with his hands cuffed behind his back – multiple officers exerted a variety of types of excessive and unnecessary force and restraint, including two carotid control holds and taking turns putting their entire weight on Elijah's body while he lay prone and said things like "I can't breathe." Even after Elijah vomited, the officers continued to restrain him and inflict force against him, and a K-9 officer even threatened to sic his police dog on Elijah. When Aurora paramedics arrived, they found Elijah totally subdued, handcuffed, exhausted, and begging the APD officers to stop hurting him. Tragically, rather than assist Elijah, who was in a medically-impaired state due to the prolonged infliction of excessive force and restraint, the paramedics involuntarily injected Elijah with an overdose of ketamine. As a result of the ketamine overdose, Elijah struggled to breathe at a moment when his body desperately needed to ventilate in order to recover from the stresses of the multiple forms of prolonged excessive force that he had endured. Elijah could not survive the resulting damage to his body, and never regained consciousness; he was pronounced dead at the hospital days later.

27.     Elijah's family and friends remember him as a sweet, positive young man, who did his best to avoid conflict and abhorred violence. Elijah was a massage therapist dedicated to healing others. He was so averse to causing harm to another living being that he would chase flies away rather that swatting them. Elijah, whose personal motto was "Always, with gratitude," left behind a family and community who continue to grieve the loss of his love, infectious smile,

and extraordinary kindness. Yet when the APD officers encountered him in 2019, they saw none of the positivity and gentleness he was known for, just another Black man in America.

28.     In the wake of Elijah McClain's murder at the hands of Aurora police and medics, the Aurora community has responded with near-universal outrage and condemnation. Elijah's story has spread worldwide and become one more in a long-list of stories of young, Black men and women murdered by law enforcement, that have galvanized people in calling for greater police accountability and even the abolition of brutal, racist police departments in their entirety.[2]

29.     As part of this movement, both to honor Elijah's life and to call for a true reckoning with our broken system of policing, Plaintiffs took part in organizing and attending a violin vigil[3] in Elijah's memory on June 27, 2020.

30.     The violin vigil had special meaning because Elijah, the kind and gentle soul that he was, would regularly serenade on his violin lonely animals waiting to be adopted.

31.     Prior to the vigil, Plaintiffs obtained approval from the City of Aurora to hold the vigil on the Great Lawn in Aurora's Municipal Complex. While the vigil was set to occur at a nearby park, Aurora's Deputy City Manager, Jason Batchelor, specifically directed that the vigil take place on the Great Lawn.

32.     Professional violinists flew in from across the country to participate in the vigil, and other amateur violinists and cellists from the community committed to joining in the planned orchestra to commemorate Elijah's life and spirit.

33.     The organizers put together a makeshift stage for the musicians to perform on the

---

[2] The APD's actions underlying this case – openly assaulting families attending a peaceful violin vigil – prove the point of those calling for the abolition of the APD better than any protest, vigil, petition, or ballot initiative ever could.
[3] This event is referred to herein using the terms vigil, protest, and rally.

East end of the Great Lawn, right in front of the Aurora Municipal building.

34.     Throughout the day, before the vigil began, there had been a number of peaceful protest actions occurring on the Great Lawn and stretching to the front of the APD headquarters. There was a rally for justice for Elijah and a youth march in Elijah's memory. Participants from these actions, including some Plaintiffs, remained for the violin vigil.

35.     Around 8:00pm, while it was still light outside, the violin vigil began.

36.     A half hour later, APD shut down the vigil.

37.     Around 8:30pm, APD officers, with the assistance of officers from ACSO, JCSO, and ACSD (collectively "law enforcement officers"),[4] in full-militarized gear (including helmets, shields, facemasks, and body armor) organized in a line near the APD headquarters, on the north end of the Great Lawn. Other law enforcement officers in the same militarized garb also assembled right just north of the stage that had been set up. There were approximately one hundred and fifty law enforcement officers in both of these lines.

38.     Shortly thereafter, and within minutes of the vigil beginning, law enforcement officers made an announcement that the gathering was a so-called "unlawful" assembly. However, that announcement was only made to those gathered immediately in front of the police headquarters. It was not clear from the Great Lawn.

39.     There was no basis for declaring the assembly unlawful. There was no violence or property destruction occurring. There was no threat of imminent violence or property destruction. The vigil was completely peaceful, and previously authorized to take place on the Great Lawn by Aurora itself.

---

[4] Arapahoe, Jefferson, and Adams County personnel were, at all times, operating under the control of APD and Defendant Wilson pursuant to Colorado's Mutual Aid Statute that Defendant Wilson and APD had invoked for policing the vigil on June 27, 2020.

40.     Within a minute of this announcement, with no other warning, and without reason, the two lines of law enforcement officers began to advance on the vigil attendees.

41.     While advancing on the peaceful crowd, law enforcement officers began to indiscriminately: (1) spray those gathered with pepper spray, (2) throw chemical agent canisters into the crowd, (3) shoot foam and/or rubber bullets at attendees; (4) shoot bean bag rounds at attendees; and (5) strike, hit, jab, prod, shove, and/or push with batons those who did not immediately retreat.

42.     Law enforcement officers indiscriminately deployed chemical agents on multiple children who were gathered to listen to the violinists.

43.     The law enforcement officers' advancement into the crowd caused a rush of vigil attendees attempting to escape the line of fire.

44.     As the law enforcement officers advanced through the crowd, the vigil attendees retreated in fear. Law enforcement officers effectively pushed nearly everyone sitting and listening to the musicians play off the Great Lawn.

45.     The law enforcement officers continued to advance until they nearly reached the stage.

46.     After dispersing the vigil, the law enforcement officers continued to stand in full military gear, menacingly staring down those who had gathered on the Great Lawn.

47.     Vigil attendees began to plead with the officers to "please leave us alone." Despite these pleas, the law enforcement officers continued to hold the Great Lawn in a show of force and intimidation.

48.     In a brazen intimidation tactic, the law enforcement officers remained blocking the Great Lawn for almost an hour.

49.     By the time the law enforcement officers had finished clearing the Great Lawn, approximately half of those assembled had fled in fear (or from the physical impact) of chemical agents and the indiscriminate force inflicted by the officers. Those individuals did not return for the remainder of the violin vigil.

**Lindsay Minter**

50.     Plaintiff Lindsay Minter is an active leader in the Aurora Community. She serves on the APD's Oversight Task Force and has worked at the forefront of multiple community causes. She was involved in both organizing and participating in the planning of protest activities earlier during the day of June 27, 2020 and looked forward to attending the violin vigil that evening.

51.     As a person committed empowering and engaging young people in her community, Ms. Minter was excited to share the violin vigil with her friend and her young cousins (ages 15 and 17).

52.     She and her friend and cousins arrived early to get a spot near the stage and set up a blanket, lawn chairs, and a cooler with drinks in anticipation of sitting on the Great Lawn and bearing witness to the violin vigil.

53.     Ms. Minter, along with her friends and family, were sitting near the stage listening to the musicians when she heard people saying, "oh no," and stood up to see scores of law enforcement officers dressed in full riot gear marching in formation toward the grass.

54.     From where Ms. Minter was standing, she did not see any vigil attendee engage in any violent behavior, threaten any violence, or engage in any destruction of property. She also did not hear any orders to disperse.

55.     Ms. Minter ran across the stage, yelling to the musicians, "Keep playing! Keep

playing!" She told the crowd, "Protect the violinists!" and directed protesters to put their bodies between the musicians and the riot police.

56.     Ms. Minter was near the stage when the law enforcement officers began firing chemical agents and projectiles indiscriminately into the crowd.

57.     Ms. Minter observed the law enforcement officers advance on peaceful protesters as officers continued to move toward the stage where the musicians were trying to keep playing.

58.     As the law enforcement officers continued to advance, frightened musicians began packing up their instruments.

59.     Ms. Minter led by example, putting her own body between the law enforcement officers and peaceful protesters.

60.     Ms. Minter looked on in horror as the law enforcement officers sprayed pepper spray directly in the faces and eyes of peaceful protestors, who fell to the ground. Law enforcement officers stepped on the fallen protesters as the officers continued to march into the crowd.

61.     Ms. Minter was overcome by the chemical agents in the air, and ran, coughing, to find her friend and her young cousins.

62.     Both Ms. Minter and one of her young cousins suffer from asthma and struggled to breathe from the chemical agents.

63.     Ms. Minter and her minor cousin were coughing and wheezing, and were both forced to use their rescue inhalers in order to breathe.

64.     Ms. Minter poured water on the faces of her minor cousins, and even used eye wash that she had brought along just in case, to try and soothe her cousins' eyes, burning from the chemical agents.

65.     Ms. Minter and her family were traumatized and in pain, and reasonably concluded that it was unsafe for them to stay. They packed up their belongings and left.

66.     Ms. Minter was disappointed to be forced to leave the vigil by the law enforcement officers' brutal and wholly unnecessary actions.

**Pastor Thomas Mayes**

67.     Plaintiff Dr. Thomas Mayes serves as Pastor at Living Water Christian Center Church. He is an active leader in the Aurora community. Pastor Mayes serves on the APD's Independent Review Board and the Victims Witness Advisory Board. He is a member of the Greater Metro Denver Ministerial Alliance and is a Silver Life Member of the NAACP. Pastor Mayes attended the vigil as a faith leader in the Aurora community.

68.     When Pastor Mayes arrived at the vigil, he initially went to the location that had been planned: a nearby park. When he arrived at this location he was informed by a Aurora city councilmember, Allison Coombs, that Aurora Deputy City Manager had invited those organizing the vigil to hold it on the Great Lawn.

69.     Following Ms. Coombs directive, Pastor Mayes walked toward the Great Lawn, by way of the area in front of the APD headquarters.

70.     When he arrived, there were a few hundred people present. Pastor Mayes walked through the crowd and found a spot directly adjacent to the APD headquarters, near the east side of the Great Lawn.

71.     Shortly after arriving at the vigil, Pastor Mayes heard the law enforcement officers announce on a loudspeaker that the assembly was unlawful.

72.     Pastor Mayes did not see any vigil attendee engage in any violent behavior, threaten any violence, or engage in any destruction of property before or after he heard the law

15

enforcement officers announce that the assembly was unlawful.

73.     As soon as Pastor Mayes heard the dispersal order, he began to leave. Pastor

Mayes wanted to avoid becoming a victim of police violence even though he had done nothing

wrong. However, the law enforcement officers did not afford Pastor Mayes or the rest of the

crowd adequate time to retreat. The law enforcement officers began indiscriminately shooting

projectiles and chemical agents in Pastor Mayes' immediate vicinity less than five minutes from

the time they announced that the assembly was unlawful. As Pastor Mayes hustled away, he saw

smoke rising.

74.     Although he had planned to stay at the vigil, Pastor Mayes continued walking to

his car and left. He did not return because he feared being exposed to chemical agents, and force,

from the law enforcement officers.

**Kristin Mallory**

75.     Plaintiff Kristin Mallory was another vigil organizer and attendee. She is the

Arapahoe County Democratic Party Chair.

76.     Ms. Mallory felt compelled to help organize and attend the vigil after watching

the video of APD officers murdering Elijah. On the night the body-worn camera footage of

Elijah's murder was released to the public, Ms. Mallory watched in horror. Since that day, she

has continued to be concerned that Aurora does not hold its officers accountable, and particularly

those who murdered Elijah.

77.     Ms. Mallory was present on the Great Lawn throughout the day on June 27, 2020.

She initially showed up for the rally that preceded the violin vigil, and arrived around 2:00pm.

Ms. Mallory briefly left the Great Lawn to cool down from the day's heat, but returned around

6:20pm to help with the organization of the vigil and to break down the sound equipment from

the youth march in Elijah's memory that had just occurred.

78.     Throughout the day and the vigil that evening, Ms. Mallory was joined by Aurora city councilmembers Juan Marcano and Alison Coombs.

79.     At one point in the afternoon, Defendant Wilson texted Councilmember Marcano and stated that individuals in the crowd were gathering rocks. In response, Ms. Mallory and Councilmember Marcano walked through the entire crowd. Although they were actively looking for it, they were unable to find any evidence to suggest that anyone was gathering rocks, or engaging in any form of violence or property destruction.

80.     Around 6:45pm, as Ms. Mallory was helping put away sound equipment from the youth march, she was told by Mr. Batchelor to hold the violin vigil on the Great Lawn (and not at City Center Park, where the violin vigil was initially planned to occur) because the acoustics would be better, and it was public property that they were free to use. Because of Mr. Batchelor's invitation, Ms. Mallory, along with Councilmembers Marcano and Coombs, went down to City Center Park and began to direct vigil attendees (and the amateur violinists who were beginning to assemble) to the Great Lawn.

81.     At approximately 8:30pm, Ms. Mallory returned to the Great Lawn, along with her husband, Councilmember Marcano, and Councilmember Coombs.

82.     Ms. Mallory sat near the front of the makeshift stage on the north side of the fountains. As Ms. Mallory sat here, she noticed that the crowd was sitting peacefully listening to the violinists socially-distanced from one another.

83.     As Ms. Mallory was listening to the violinists play, she noticed that a line of law enforcement officers began to line up near the APD headquarters. Ms. Mallory was sitting approximately twenty-five yards from the APD headquarters and the law enforcement officers

17

were behind her.

84.     At no point did Ms. Mallory hear any disbursement order, or any order at all, from the law enforcement officers.

85.     Suddenly (and without warning), the law enforcement officers began marching in a "L" shape from in front of the APD headquarter out into the Great Lawn. The law enforcement officers cut off the middle of the Great Lawn. Everyone in the middle of the Great Lawn was pushed off of the Great Lawn.

86.     As Ms. Mallory watched the law enforcement officers use force to push those gathered off the Great Lawn, she observed that the law enforcement officers began to deploy chemical agents into the crowd.

87.     After witnessing the law enforcement officers deploy chemical agents, Ms. Mallory's throat and nose began to burn. She also began to cough.

88.     Ms. Mallory, and those near her, formed a ring around the stage to protect the musicians from the law enforcement officers.

89.     As the law enforcement officers continued to push the vigil attendees off the Great Lawn, Ms. Mallory saw Councilmember Coombs asking the officers "what are these people doing wrong?" The law enforcement officers did not respond.

90.     Eventually, nearly everyone, including Ms. Mallory, was pushed off the Great Lawn. Shortly after having suffered the effects of the chemical agents, and being pushed off the Great Lawn, Ms. Mallory and her husband were forced to leave the vigil. They did not return.

91.     Throughout the day, and during the vigil in particular, Ms. Mallory did not see any vigil attendee engage in any violent behavior, threaten any violence, or engage in any destruction of property.

**Tyler Sprague and Alissia Acker**

92.     Plaintiffs Tyler Sprague and Alissia Acker arrived to participate in the rally that preceded the violin vigil around 4:40pm. They were driven to attend the protest by what happened to Elijah at the hands of Aurora police, and what happened to Ms. Acker's brother, Michael, at the hands of Denver police (who had brutalized Michael during the Denver protests following George Floyd's murder).

93.     Mr. Sprague and Ms. Acker gathered with those who had assembled near the APD headquarters. For the next three or so hours Mr. Sprague and Ms. Acker participated in the rally that was occurring on the Great Lawn near the APD headquarters.

94.     Eventually, right before the violin vigil was about to begin, Mr. Sprague and Ms. Acker moved away from the APD headquarters and toward the east side of the Great Lawn.

95.     Almost immediately after the violin vigil began, law enforcement officers wearing riot gear gathered in a line in front of the APD headquarters and issued an order that the assembly was unlawful. Within moments, the law enforcement officers began marching and pushing the crowd back. While doing so, the law enforcement officers began prodding those gathered in front of Mr. Sprague and Ms. Acker with their batons.

96.     When Mr. Sprague and Ms. Acker saw the officers marching on the violin vigil, they stood their ground so as to protect the other attendees behind them (including a number of families with children). Mr. Sprague and Ms. Acker found themselves in the front line facing the advancing law enforcement officers. They locked arms with others to stop the officers from pushing all of the vigil attendees off the Great Lawn.

97.     The law enforcement officers began throwing cannisters of chemical agents near Mr. Sprague and Ms. Acker and prodding them with their batons.

98.     Then, one APD officer, Defendant f/n/u Rodriguez, swung her or his baton and struck Ms. Acker in the hip. Ms. Acker cried out in pain. This strike caused a softball-sized bruise on Ms. Acker's hip.

99.     Then, without warning, the law enforcement officers pepper-sprayed Mr. Sprague and Ms. Acker straight in the face. Ms. Acker screamed in pain and repeatedly yelled, "I can't breathe!" as the officers continued to coat both her, and Mr. Sprague, from head-to-toe with pepper spray.

100.    While Ms. Acker was incapacitated by the pepper spray, another law enforcement officer struck Ms. Acker in the head with her or his baton. This strike caused Ms. Acker to black out for approximately ten seconds.

101.    While they were blinded, a medic from the crowd dragged Mr. Sprague and Ms. Acker out of the crowd. After regaining their eyesight, Mr. Sprague and Ms. Acker immediately left the protest and did not return because of the force that had been inflicted on them.

102.    Eventually, Ms. Acker went to the hospital. She was diagnosed with a hematoma on her head and concussion from the baton strike.

103.    Throughout their time at the rally and vigil, Mr. Sprague and Ms. Acker did not see anyone engage in any violence or destruction of property. Both Mr. Sprague and Ms. Acker were close to the APD headquarters throughout their time at the protest. They never saw anyone throw any rocks at the law enforcement officers or cross the barriers that the law enforcement officers had erected.

**Irma Jolene Fisher and Tobias Hopp**

104.    Dr. Irma Jolene Fisher and Dr. Tobias Hopp are university professors. They attended the vigil to show their solidarity with the family of Elijah McClain.

105.    Dr. Fisher and Dr. Hopp arrived at the rally that preceded the violin vigil earlier in the day. They marched with demonstrators through Aurora and arrived back at the Aurora Municipal Complex at approximately 6:30 p.m. Upon arrival, Dr. Fisher and Dr. Hopp went to the area in front of the Aurora Police Department Headquarters where rallygoers had gathered. Dr. Fisher and Dr. Hopp stood at a vantage point where they could see the fence that APD had erected to prevent protesters from going near the entrance to the APD Headquarters, along with the crowd of demonstrators. When Dr. Fisher and Dr. Hopp arrived, Defendant law enforcement officers were already in riot gear, and were carrying around less-than-lethal munitions.

106.    Dr. Fisher and Dr. Hopp stood and observed the rally for the next two hours. During that time, they saw that the crowd was peaceful. The protesters were near the fence that was blocking the entrance to the Aurora Police Department Headquarters and every time the law enforcement officers would change positions, the protesters would step back, put their hands up, and say "don't shoot." Dr. Fisher and Dr. Hopp heard several announcements from law enforcement during this time – including an announcement that crossing the fence was unlawful (and when this announcement was made those near the fence stepped back and put their hands up) and once an announcement that throwing things would be unlawful, at which time the protesters booed. They never witnessed anyone throw anything at the law enforcement officer.

107.    Dr. Fisher and Dr. Hopp did not notice anything peculiar about the crowd; it seemed to them to be a normal crowd. Most people, including Dr. Fisher and Dr. Hopp, were wearing masks because of the COVID-19 pandemic.

108.    Around 8:30 pm, Dr. Fisher and Dr. Hopp left the area near the Aurora Police Department Headquarters and moved toward the middle of the Great Lawn. When they left that area, Dr. Fisher mentally noted that the dynamic between the rally attendees and the law

enforcement officers was not any different than it had been throughout the last two hours.

109.    Dr. Fisher and Dr. Hopp took a seat on the opposite side of the Great Lawn and listened to the violins. They observed numerous families and children seated around them. The next twenty minutes were beautiful.

110.    That beautiful moment was soon shattered by the law enforcement officers announcing that the violin vigil was an "unlawful assembly." Dr. Fisher and Dr. Hopp observed that it seemed as though many of the families seated around them, and the violinists, did not hear this announcement because they did not react to it at all. Within minutes of that announcement, Dr. Fisher and Dr. Hopp observed that a wall of law enforcement officers had begun to form near the Aurora Police Department Headquarters. This action alone created fear and panic among the families surrounding Dr. Fisher and Dr. Hopp.

111.    Then, law enforcement officers began to march on the panicked crowd. Dr. Fisher watched in horror as law enforcement officers sprayed a young girl directly in the face with OC spray. Dr. Fisher watched as children cried and mothers frantically tried to gather their children.

112.    Dr. Fisher and Dr. Hopp moved back as law enforcement officers continued to advance on them and the rest of the vigil attendees.

113.    Dr. Fisher watched as law enforcement officers used their batons to strike and jab the vigil attendees as they advanced on them.

114.    At one point, Dr. Fisher was pinned between the frantic crowd behind her and the line of law enforcement officers. She knelt to the ground as she had nowhere to go. Dr. Hopp grabbed Dr. Fisher and pulled her through the crowd. Had Dr. Hopp not done this, the line of law enforcement officers would have bowled over Dr. Fisher, as they did other peaceful protesters.

115.    Eventually, the advancing law enforcement officers pushed Dr. Fisher and Dr.

Hopp into the parking lot. They stayed at the vigil for another twenty minutes, but left after feeling intimidated by another announcement by law enforcement officers that the assembly was "unlawful." They did not return. When they left, the law enforcement officers were continuing to hold the Great Lawn and confining vigil attendees to the parking lot.

116.    While they were being pushed back into the parking lot with other attendees, Dr. Fisher and Dr. Hopp were hit with the CS spray indirectly. Dr. Fisher's eyes burned. Dr. Hopp had a strong reaction to the noxious chemicals and had strong stomach pain that lasted after the vigil.

117.    In addition to their physical injuries, Dr. Fisher and Dr. Hopp were distraught about the loss of their right to participate in First Amendment activity. Dr. Fisher had a particularly strong emotional reaction to what she witnessed. For the next week, she felt extremely anxious.

### Aurora Police Department Defendants Used Excessive Force, And Violated Plaintiff Class Members' Rights Under The United States And Colorado Constitutions

118.    Defendant Commander Stephen Redfearn oversaw and directed Defendants who pushed Plaintiffs off the Great Lawn. Defendant Redfearn used and ordered the use of force to do so. Defendant Redfearn made the announcement that the peaceful gathering was a so-called "unlawful assembly" despite knowing there was no valid legal basis to do so, without adequate time for Plaintiff Class Members to comply, and without leaving room for safe egress.

119.    Defendant Redfearn ordered a group of Defendants to throw smoke cannisters and other chemical agents indiscriminately into the crowd and did nothing to stop those under this command from using force. Defendant Redfearn also used force himself including deploying a pepper foam fogger at Plaintiff Class Members. He took these actions despite knowing that Plaintiff Class Members posed no threat, had committed no crime, were not inciting imminent

lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

120.     Defendant Sergeant Delbert L. Jr. Tisdale directed a squad of Defendants who pushed Plaintiffs off the Great Lawn, while using force to do so including at least the following: Defendant Tisdale shoved several Plaintiff Class Members with his hands, despite knowing that Plaintiff Class Members posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum. Defendant Tisdale has been a named defendant in previous cases, included for the excessive use of force.

121.     Defendant Lieutenant Michael McClelland oversaw and directed Defendants to push Plaintiffs off the Great Lawn, and he used, ordered, and approved the use of force to do so, including at least the following: Defendant McClelland deployed OC spray on numerous Plaintiff Class Members and saw those under this command use excessive force against them, but did nothing to stop them. Defendant McClelland took these actions despite knowing that Plaintiff Class Members posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

122.     Defendant Metro Division Chief Terry Brown oversaw and directed Defendants to push Plaintiffs off the Great Lawn. Defendant Brown also supervised and approved Defendants use force to do so, including at least the following: Defendant Brown saw Defendants use of OC spray, batons, and LLLs against the named Plaintiffs and Plaintiff Class Members, but did nothing to stop those under his command from using force. Defendant Brown did this knowing that Plaintiff Class Members posed no threat, had committed no crime, were

not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

123.    Defendant Reginald DePass oversaw a large contingent of the line of Defendants who pushed Plaintiffs off the Great Lawn. Defendant DePass supervised a number of officers who used force to do so, including at least the following: Defendant DePass did nothing to stop those under his command from using force despite the fact that Plaintiff Class Members posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum. Notably, Defendant DePass has a history of using excessive force and failing to intervene to stop excessive force, including against Alberto Torres, a Spanish-speaking man who momentarily paused to call his English-speaking wife to help translate because he could not understand officers' directives. Mr. Torres was so injured that he lost his job and his home.

124.    Defendant Officer Nathaniel Moss was a part of the line of Defendants who pushed Plaintiffs off the Great Lawn, while using force to do so, including at least the following: Defendant Moss struck multiple Plaintiff Class Members with his baton and repeatedly deployed OC spray to their faces. Defendant Moss took these actions despite knowing that Plaintiff Class Members posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

125.    Defendant Officer Stephen T. Garber was a part of the line of Defendants who pushed Plaintiffs off the Great Lawn, and he used force to do so, including at least the following: Defendant Garber struck multiple Plaintiff Class Members bodies (in addition to their shields and skateboards) with his baton, and repeatedly deployed OC spray to class members' faces. Defendant Garber took these actions despite knowing that Plaintiff Class Members posed no

threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

126.     Defendant Darren Chamberland was part of the line of Defendants who pushed Plaintiffs off the Great Lawn. Defendant Chamberland used force to do so, including at least the following: Defendant Chamberland sprayed a member of the Plaintiff Class directly in the face with OC Spray. He took these actions despite the fact that Plaintiff Class Members posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum. Notably, Defendant Chamberland has a history of using excessive force, including against Rickey Burrell on December 18, 2010, when responding to a 911 call from his family that he was having a seizure. Rickey Burrell, a Black man, was lying helpless in his bed when Chamberland and other Aurora officers inexplicably jumped on Mr. Burrell, wrenched his arm behind his back, handcuffed him, then roughly dragged Mr. Burrell outside, though he was clad only in underwear that he had soiled during his seizure. Mr. Burrell suffered a wrist fracture and other injuries to his back and shoulder as a result of the officers' actions. Aurora paid $100,000 to settle Mr. Burrell's claims. Aurora did not discipline any of the involved officers for their unconstitutional actions.

127.     Defendant Matthew Brukbacher was part of the line of Defendants who pushed Plaintiffs off the Great Lawn. Defendant Brukbacher used force to do so, including at least the following: Defendant Brukbacher indiscriminately shot multiple members of the Plaintiff Class with 40mm baton rounds, including shooting members of the Plaintiff Class who were simply attempting to cover a smoke grenade with a cone so as to protect children in the crowd. Then, Defendant Brukbacher sprayed multiple peaceful protesters with OC Spray simply because parts of the line advancing on Plaintiff Class Members was falling behind other portions of the line.

He took these actions despite the fact that Plaintiff Class Members posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

128.    Defendant William Hummel was part of the line of Defendants who pushed Plaintiffs off the Great Lawn. Defendant Hummel used force to do so, including at least the following: Defendant Hummel shot a smoke canister into the crowd. Then, later, Defendant Hummell sprayed multiple members of the Plaintiff Class with OC spray in the face, from point-blank range. This OC spray carried throughout the crowd and affected numerous members of the Plaintiff Class. He took these actions despite the fact that Plaintiff Class Members posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

129.    Defendant Daniel Smick was part of the line of Defendants who pushed Plaintiffs off the Great Lawn. Defendant Smick used force to do so, including at least the following: Defendant Smick indiscriminately shot members of the Plaintiff Class with 40mm baton rounds. Then, Defendant Smick pushed a family. He took these actions despite the fact that Plaintiff Class Members posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

130.    Defendant Officer Jason Bubna was part of the line of Defendants who pushed Plaintiffs off the Great Lawn, and used force to do so as a grenadier including at least the following: Armed with a 40mm "less lethal launcher" ("LLL"), Defendant Bubna shot several Plaintiff Class Members with the LLL, in addition to shoving other Plaintiff Class Members with his arms to push them backwards. He did so despite knowing they posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were

engaged in a peaceful, lawful protest at a public forum.

131.    Defendant Officer Austin Runyon was part of the line of Defendants who pushed Plaintiffs off the Great Lawn, and he used force to do so as a grenadier, including at least the following: Armed with a 40mm Penn Arms launcher, Defendant Runyon shot several Plaintiff Class Members with 40mm foam baton rounds, despite knowing they posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

132.    Defendant Officer Sammie II Wicks was part of the line of Defendants who pushed Plaintiffs off the Great Lawn, and he used force to do so as a grenadier, including at least the following: Armed with a 40mm LLL, Defendant Wicks shot Plaintiff Class Members with 40mm foam baton rounds, despite knowing they posed no threat, had committed no crime, was not inciting imminent lawless action, was not fleeing, and was engaged in a peaceful, lawful protest at a public forum.

133.    Defendant Joshua Winters was part of the line of Defendants who pushed Plaintiffs off the Great Lawn. Defendant Winters used force to do so, including at least the following: Defendant Winters shot a member of the Plaintiff Class with two 12 gauge beanbag rounds. He took these actions despite the fact that Plaintiff Class Members posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

134.    Defendant Kevin Deichsel was part of the line of Defendants who pushed Plaintiffs off the Great Lawn. Defendant Deichsel used force to do so, including at least the following: Defendant Deichsel used his baton against two members of Plaintiff Class who were sitting on the ground, and forced one of them to the ground while another officer arrested that

individual. Then, later, while the line was advancing on the peaceful protesters, Defendant

Deichsel struck another member of the Plaintiff Class in the ribs with his baton multiple times;

he would repeat these actions against other peaceful protesters on multiple occasions. As he

moved forward, forcing Plaintiff Class Members off the Great Lawn, Defendant Deichsel

repeatedly jabbed members of the Plaintiff Class with his baton. At one point, he encountered

Plaintiff Class Members who had their arms locked together and were standing still. Defendant

Deichsel used his swung his baton and hit the peaceful protesters in the arm, causing them to

break their arms apart. He took these actions despite the fact that Plaintiff Class Members posed

no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing,

and were engaged in a peaceful, lawful protest at a public forum.

135.    Defendant Ryan Sweeney was part of the line of Defendants who pushed

Plaintiffs off the Great Lawn. Defendant Sweeney used force to do so, including at least the

following: Defendant Sweeney whacked multiple members of Plaintiff Class with his baton. He

took these actions despite the fact that Plaintiff Class Members posed no threat, had committed

no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a

peaceful, lawful protest at a public forum.

136.    Defendant Jordan O'Neal was part of the line of Defendants who pushed

Plaintiffs off the Great Lawn. Defendant Sweeney used force to do so, including at least the

following: Defendant O'Neal struck multiple members of Plaintiff Class with his baton. He took

these actions despite the fact that Plaintiff Class Members posed no threat, had committed no

crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a

peaceful, lawful protest at a public forum.

137.    Defendant Officer Caleb Joseph Parrella was a part of the line of Defendants who

pushed Plaintiffs off the Great Lawn, and he used force to do so, including at least the following: Defendant Parrella jabbed and violently struck numerous Plaintiff class members with his baton. Defendant Parrella took these actions despite knowing that Plaintiff Class Members posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

138.    Defendant Officer Edward Vance was a part of the line of Defendants who pushed Plaintiffs off the Great Lawn, and he used force to do so, including at least the following: Defendant Vance struck and shoved several Plaintiff Class Members with his baton, despite knowing they posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

139.    Defendant Officer Nicholas Matthew Wilson was a part of the line of Defendants who pushed Plaintiffs off the Great Lawn, and he used force to do so including at least the following: Defendant Wilson struck a Plaintiff Class Member in the chest with his baton. He again struck the Plaintiff class member with his baton a second time without provocation. Defendant Wilson also forcefully shoved several other Plaintiff Class Members. He took these actions despite knowing that Plaintiff Class Members posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

140.    Defendant Investigator Michael Bender was a part of the line of Defendants who pushed Plaintiffs off the Great Lawn, and he used force to do so, including at least the following: Defendant Bender struck numerous Plaintiff Class Members with his baton, despite knowing they posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

141.     Defendant Officer Kathrine Lewis was a part of the line of Defendants who pushed Plaintiffs off the Great Lawn, and she used force to do so, including at least the following: Defendant Lewis jabbed multiple Plaintiff Class Members with her baton, despite knowing they posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

142.     Defendant Officer Dejon S. Marsh was a part of the line of Defendants who pushed Plaintiffs off the Great Lawn, while using force to do so, including at least the following: Defendant Dejon forcefully shoved several Plaintiff class members backwards with his baton, and struck another protestor with his baton. Defendant Marsh took these actions despite knowing that Plaintiff Class Members posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

143.     Defendant Officer Robert Rosen was a part of the line of Defendants who pushed Plaintiffs off the Great Lawn, while using force to do so, including at least the following: Defendant Rosen shoved multiple members of the Plaintiff class with his baton and deployed OC spray indiscriminately into the crowd. Defendant Rosen took these actions despite knowing that Plaintiff Class Members posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

144.     Defendant Ronald Jauregui-Gutierrez was a part of the line of Defendants who pushed Plaintiffs off the Great Lawn, and he used force to do so, including at least the following: Defendant Jauregui-Gutierrez pushed multiple Plaintiff Class Members with his baton, and deployed OC spray indiscriminately into the crowd. Defendant Jauregui-Gutierrez took these

31

actions despite knowing that Plaintiff Class Members posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

145.    Defendant Detective Haden D. Jonsgaard was part of the line of Defendants that pushed Plaintiffs off the Great Lawn. Defendant Jonsgaard used force to do so, including at least the following: He shoved several Plaintiff Class Members backwards with his baton, in addition to repeatedly striking other Plaintiffs' shields with his baton. Defendant Jonsgaard did so despite knowing the Plaintiff Class Members posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

146.    Defendant Matthew Green was part of the line of Defendants who pushed Plaintiffs off the Great Lawn. Defendant Green used force to do so, including at least the following: Defendant Green jabbed numerous members of the Plaintiff Class with his baton, despite the fact that they posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum. Notably, Defendant Green has a history of using excessive force, including against Elijah McClain. On August 24, 2019, while Elijah McClain was fully restrained, handcuffed on the ground under the weight of officers, exclaiming that *he could not breathe,* Defendant Green threatened to sic a dog on him. Defendant Green also held down his legs.

147.    Defendant Detective Ethan Snow was a part of the line of Defendants who pushed Plaintiffs off the Great Lawn, and he used force to do so including at least the following: Defendant Snow used his baton to shove several Plaintiff Class Members backwards, despite knowing they posed no threat, had committed no crime, were not inciting imminent lawless

action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum. Notably, Defendant Snow has a history of using excessive force, including against Alberto Torres, a Spanish-speaking man who momentarily paused to call his English-speaking wife to help translate because he could not understand Snow's directives. Mr. Torres was so injured that he lost his job and his home.

148.    Defendant Detective Brian McClure was part of the line of Defendants who pushed Plaintiffs off the Great Lawn, and used force to do so including at least the following:. Defendant McClure shoved Plaintiff Class Members, including a woman and her teenage daughter, despite knowing they posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum. Additionally, Defendant McClure took these actions despite being unsure whether Plaintiff Class Members heard his demand to move, and seeing them attempt to back away.

149.    Defendant SWAT Officer Scott Osgood was a part of the line of Defendants who pushed Plaintiffs off the Great Lawn, and he used force to do so, including at least the following: Defendant Osgood shoved multiple Plaintiff Class Members with his hands, despite knowing they posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

150.    Defendant Officer Ryan Stoller was a part of the line of Defendants who pushed Plaintiffs off the Great Lawn, and he used force to do so, including at least the following: Defendant Stoller shoved several Plaintiff Class Members, despite knowing they posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

151.    Defendant Juan Gonzalez was part of the line of Defendants who pushed

33

Plaintiffs off the Great Lawn. Defendant Gonzalez used force to do so, including at least the following: Defendant Gonzalez jabbed numerous members of the Plaintiff Class with his baton, despite the fact that they posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

152.    Defendant Officer Jennifer McCormack was a part of the line of Defendants who pushed Plaintiffs off the Great Lawn, and she used force to do so, including at least the following: Defendant McCormack shoved several Plaintiff Class Members with her baton, despite knowing they posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

153.    Defendant Nicholas Brungardt was part of the line of Defendants who pushed Plaintiffs off the Great Lawn. Defendant Brungardt used force to do so, including at least the following: Defendant Brungardt jabbed multiple members of Plaintiff Class with his baton. He took these actions despite the fact that Plaintiff Class Members posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

154.    Defendant Joshua BeBee was part of the line of Defendants who pushed Plaintiffs off the Great Lawn. Defendant BeBee used force to do so, including at least the following: Defendant BeBee jabbed multiple members of Plaintiff Class with his baton. He took these actions despite the fact that Plaintiff Class Members posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

155.     Defendant Steven Brenneman was part of the line of Defendants who pushed Plaintiffs off the Great Lawn. Defendant Brenneman used force to do so, including at least the following: Defendant Brenneman jabbed numerous members of the Plaintiff Class with his baton, despite the fact that they posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

156.     Defendant Nicholas Lesansky was part of the line of Defendants who pushed Plaintiffs off the Great Lawn. Defendant Lesansky used force to do so, including at least the following: Defendant Lesansky jabbed numerous members of the Plaintiff Class with his baton, despite the fact that they posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

157.     Defendant Matthew Campbell was part of the line of Defendants who pushed Plaintiffs off the Great Lawn. Defendant Campbell used force to do so, including at least the following: Defendant Campbell jabbed numerous members of the Plaintiff Class with his baton, despite the fact that they posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

158.     Defendant Cory Mankin was part of the line of Defendants who pushed Plaintiffs off the Great Lawn. Defendant Mankin used force to do so, including at least the following: Defendant Mankin jabbed numerous members of the Plaintiff Class with his baton, despite the fact that they posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

159.    Defendant Greta Salazar was part of the line of Defendants who pushed Plaintiffs off the Great Lawn. Defendant Salazar used force to do so, including at least the following: Defendant Salazar jabbed numerous members of the Plaintiff Class with his baton, despite the fact that they posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

**Arapahoe County  Defendants Used Excessive Force, And Violated Plaintiff Class Members' Rights Under The United States And Colorado Constitutions**

160.    Defendant Ben Bullard was part of the line of Defendants who pushed Plaintiffs off the Great Lawn. Defendant Bullard used force to do so, including at least the following: Defendant Bullard hit multiple members of the Plaintiff Class in the chest with his baton (including hitting one female Plaintiff Class Member in the chest while she wept in front of him), despite the fact that they posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

161.    Defendant Sean Conley was part of the line of Defendants who pushed Plaintiffs off the Great Lawn. Defendant Conley used force to do so, including at least the following: Defendant Conley hit one member of the Plaintiff Class in the hand three times with his baton, struck multiple other members of the Plaintiff Class with his baton (baseball-bat-style) in the chest, and watched as other Defendants used OC spray and other munitions on members of the Plaintiff Class, despite the fact that they posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

162.    Defendant Greg Bryant was part of the line of Defendants who pushed Plaintiffs off the Great Lawn. Defendant Bryant used force to do so, including at least the following:

Defendant Bryant sprayed multiple members of the Plaintiff Class in the face with OC spray, despite the fact that they posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

163.     Defendant Christopher (Shane) Purcell was part of the line of Defendants who pushed Plaintiffs off the Great Lawn. Defendant Purcell used force to do so, including at least the following: Defendant Purcell hit multiple members of the Plaintiff Class with his baton, despite the fact that they posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

164.     Defendant Tyler Teigen was part of the line of Defendants who pushed Plaintiffs off the Great Lawn. Defendant Teigen used force to do so, including at least the following: Defendant Teigen jabbed multiple members of the Plaintiff Class with his baton and clubbed multiple other members of the Plaintiff Class with his baton, despite the fact that they posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

165.     Defendant Robert Weatherspoon was part of the line of Defendants who pushed Plaintiffs off the Great Lawn. Defendant Weatherspoon used force to do so, including at least the following: Defendant Weatherspoon jabbed multiple members of the Plaintiff Class with his baton, despite the fact that they posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

166.     Defendant Lewis Litwiler was part of the line of Defendants who pushed Plaintiffs off the Great Lawn. Defendant Litwiler used force to do so, including at least the

following: Defendant Litwiler jabbed multiple members of the Plaintiff Class with his baton, despite the fact that they posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

167.    Defendant Ryan McConnell was part of the line of Defendants who pushed Plaintiffs off the Great Lawn. Defendant McConnell used force to do so, including at least the following: Defendant McConnell jabbed multiple members of the Plaintiff Class in the chest with her or his baton, despite the fact that they posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

168.    Defendant Brandon Holder was part of the line of Defendants who pushed Plaintiffs off the Great Lawn. Defendant Holder used force to do so, including at least the following: Defendant Holder pushed at least one member of the Plaintiff Class in the chest, despite the fact that they posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

**JSCO Defendants Used Excessive Force, And Violated Plaintiff Class Members Rights Under The United States And Colorado Constitutions**

169.    Defendant Anthony Rosales was part of the line of Defendants who pushed Plaintiffs off the Great Lawn. Defendant Rosales used force to do so, including at least the following: Defendant Rosales jabbed and struck numerous members of the Plaintiff Class with his baton, despite the fact that they posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

170.     Defendant Greg Gompert was part of the line of Defendants who pushed Plaintiffs off the Great Lawn. Defendant Gompert used force to do so, including at least the following: Defendant Gompert jabbed numerous members of the Plaintiff Class with his baton, despite the fact that they posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

171.     Defendant Carly Simmons was part of the line of Defendants who pushed Plaintiffs off the Great Lawn. Defendant Simmons used force to do so, including at least the following: Defendant Simmons jabbed at least three members of the Plaintiff Class with her baton, despite the fact that they posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in a peaceful, lawful protest at a public forum.

**The Law Enforcement Officers Used Escalated And Excessive Force Because Of The Perceived Political Affiliation Of The Vigil Attendees**

172.     The law enforcement officers based their decision to declare the assembly unlawful, use force, and use escalated force because of their hostility toward, and their perceptions regarding the political affiliations of those in the crowd, including but not limited to their perceptions of crowd members as identifying with Antifa, Socialism, Communism, and/or Anarchism.

173.     Prior to declaring the assembly unlawful, Defendants took into account that those attending the violin vigil held signs, wore clothing, and engaged in speech that the law enforcement officers associated with these or other political and social affiliations against which they were hostile. Defendants determined that these affiliations, in part, justified declaring an unlawful assembly and using force against Plaintiff Class Members to clear the Great Lawn.

174.     These political affiliations were used by the law enforcement officers in their

decision to use force against Plaintiff Class Members, and to do so at elevated levels.

**The Law Enforcement Officers Acted At The Direction Of Aurora's Final Policymakers**

175.    Defendant Wilson personally ordered the actions of the law enforcement officers throughout the vigil.[5] Prior to the vigil, Defendant Wilson addressed the law enforcement officers and specifically authorized their use of force during the protest. During the vigil, Defendant Wilson was apprised of all of the actions of the law enforcement officers and those of the vigil attendees. She was also texting various Aurora City Council members about the vigil and the police actions she was ordering.

176.    The morning of the violin vigil, Defendant Wilson held a briefing with intelligence officers and higher-ranking Defendants present. Defendants Wilson and Sergeant Gregg Gallozzi advised these Defendants (who then informed the other Defendants, including the law enforcement officers from JCSO, ACSO, and ACSD) that a large group of violent, Antifa agitators would be attending the day-long protests to incite violence. Defendants Wilson and Gallozzi stated so without having any legitimate basis for these claims. In the briefing, Defendants Wilson and Gallozzi knowingly inflated the risk of harm that purported Antifa individuals posed, and in so doing, created a substantial risk of harm to Plaintiffs by providing a license to Defendants to treat suspected Antifa individuals as greater threats to safety, thereby justifying uses of force against them and those associated with them based on their political association. Priming the law enforcement officers with the (false) information that violent Antifa agitators would be present was reckless and deliberate conduct by Defendants that caused the

---

[5] Defendant Wilson admitted to her active leadership role throughout the vigil during a special session of the Aurora City Council convened on June 30, 2020 to explain APD's actions after the violin vigil.

law enforcement officers to unlawfully resort to using excessive and unnecessary force during the violin vigil.

177.    Aurora Deputy City Manager, Jason Batchelor, witnessed the law enforcement officers actions and openly condoned them as they were occurring. Mr. Batchelor was overheard saying "this is the dance" as the law enforcement officers advanced on peaceful vigil attendees, implying that it was the law enforcement officers' intention to order dispersal as a sort of game to interfere with the vigil. Mr. Batchelor, in his role as Deputy City Manager, oversees Aurora's police services.

**Aurora Completely Ratified The Law Enforcement Officers' Actions**

178.    After deploying chemical agents against their own community, Aurora officials at the highest levels of government ratified the law enforcement officers' actions, including those of APD, JCSO, ACSO, and ACSD.

179.    In a four-hour-long meeting that included a nearly hour-long PowerPoint presentation to the Aurora City Council, Defendant Wilson repeatedly condoned and ratified the actions of the law enforcement officers at the vigil, including their:

(1) order of dispersal to the crowd,

(2) advancement on the crowd in full military gear,

(3) use of chemical agents, projectiles, and batons on the crowd, and

(4) clearing of the Great Lawn through use of force.

180.    Tellingly, Defendant Wilson presented no physical, photographic, or video evidence that any vigil attendee had engaged in any violent action or destroyed any property during the vigil.

181.    After the City Council meeting and a full recounting of the law enforcement

officers' actions, the Aurora City Council and Mayor have taken no action to discipline any law enforcement officer, admonish the conduct of the law enforcement officers at the vigil, or otherwise reprimand any law enforcement officer for their use of force against peaceful vigil attendees.

182.     Similarly, Defendant Wilson has taken no action to discipline any law enforcement officer for their actions at the violin vigil and, has instead, continued to double-down in support of those actions in the media.

**Defendant Coffman Retaliated Against Plaintiffs Minter and Mayes For Filing This Lawsuit**

183.     Plaintiffs Minter and Mayes engaged in First Amendment protected activity when they filed this lawsuit against Defendants on July 23, 2020 to petition the government for a redress of grievances regarding Defendants' unconstitutional treatment of them and other protesters.

184.     On or around August 6, 2020, Defendant Coffman called Plaintiffs Minter and Mayes, knowing they were Plaintiffs in this lawsuit.

185.     During his phone call with Plaintiff Minter, Defendant Coffman told her that he did not believe that she could be an unbiased member of the Aurora Police Department's Civilian Oversight Task Force ("Task Force") – which Plaintiff Minter had been an instrumental part of creating – while she was participating in this lawsuit. Defendant Coffman told Plaintiff Minter that her participation in a lawsuit against Aurora and its police was, in his view "a clear conflict of interest." Defendant Coffman then gave Plaintiff Minter two options either: (1) drop out of the lawsuit or (2) resign from the Task Force. After this explicit threat, Defendant Coffman told Plaintiff Minter that if she did not take either of these actions, he would get the Aurora City Attorney involved.

186.     Defendant Coffman's threats made Plaintiff Minter extremely anxious. As a founding member of the Task Force, she felt (and continues to feel) a strong duty to represent her community. Plaintiff Minter was instrumental in the creation of the Task Force. Plaintiff Minter felt enormous pressure to either drop the lawsuit or resign from the taskforce. However, because of her resolve that both participating in the taskforce and bringing this lawsuit were important civic duties, she did not resign.

187.     Defendant Coffman made similar threats to Plaintiff Pastor Mayes. Defendant Coffman set a phone call with Plaintiff Mayes through his office as Mayor of Aurora. Defendant Coffman's secretary arranged for the call, setting an appointment for a discussion between Mayor Coffman and Pastor Mayes. Plaintiff Mayes received the call from Defendant Coffman's official telephone number as Mayor of Aurora.

188.     During his phone call with Plaintiff Mayes, Defendant Coffman told Plaintiff Mayes that he realized that Plaintiff Mayes was both a plaintiff in this lawsuit and also a member of the Task Force. Then, Defendant Coffman requested that Plaintiff Mayes take his name off the lawsuit. He told Plaintiff Mayes that being a plaintiff in this lawsuit and a member of the Task Force was a conflict of interest.

189.     Plaintiff Mayes felt very intimidated by Defendant Coffman's request. Plaintiff Mayes observed that Defendant Coffman was using his official position to try to force Plaintiff Mayes to drop out of the lawsuit. Plaintiff Mayes observed that Defendant Coffman made this request with all of the resources of Aurora behind him, including the Aurora police department. As a Black man living in Aurora, Plaintiff Mayes was already intimidated by the Aurora police, because of their actions described in this lawsuit, their history and on-going practices of racism and brutality, and the fact that Plaintiff Mayes has been stopped for no reason in the past by

Aurora police officers. As intended, Defendant Coffman's request caused Plaintiff Mayes to feel anxious about his continued participation in this lawsuit. Plaintiff Mayes felt as though he had to watch his back. Plaintiff Mayes is a vocal member of the community who believes participation in the Task Force is a significant part of his role as a leader in the community. For that reason, he did not resign from the Task Force or drop this lawsuit.

190.    Notably, Defendant Jeanette Rodriguez, who used obviously excessive force during the incident described in this lawsuit, is also on the Task Force. Defendant Coffman never called Defendant Rodriguez regarding the fact that she is both a member of the Task Force and a party in this lawsuit; Coffman never pressured her into resigning from the Task Force nor told her that remaining on the Task Force while this lawsuit was pending was a conflict of interest.

191.    Defendant Coffman's actions were an attempt to bully Plaintiffs Minter and Mayes into dropping this lawsuit or resigning from the task force. Defendant Coffman only called Plaintiffs and threatened Plaintiffs because they had filed this lawsuit. Defendant Coffman's actions would chill a person of ordinary firmness from continuing to pursue this lawsuit.

## **CLASS ALLEGATIONS**

192.    <u>Class Definition, Rule 23(b)(2), Injunctive Relief Class:</u> This class is defined as all persons who have in the past participated, presently are participating, or may in the future participate in, or be present at, demonstrations/rallies/vigils within the City of Aurora in the exercise of their rights of free speech, assembly, and petition in general, and particularly as they relate to the murder of Elijah McClain, protesting police violence, and discrimination against people of color, especially Black people.

193.     <u>Class Definition, Rule 23(b)(3):</u> Named Plaintiffs bring this action individually and on behalf of a proposed class of all other persons similarly situated pursuant to Federal Rule of Civil Procedure 23(b)(1), (b)(2), and (b)(3), including all persons present at the violin vigil who were threatened with force, or subjected to force, at the Aurora Municipal Center on June 27, 2020.

194.     Plaintiffs and the putative class were subjected to the constitutional violations described in this complaint. The legal and factual issues are common to the class and affect all class members.

195.     Plaintiffs reserve the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery.

**The Proposed Class Has Sufficient Numerosity**

196.     Each class is inclusive of people present at the vigil. Consistent with Federal Rule of Civil Procedure 23(a), the members of the class are so numerous that joinder of all members is impracticable. The Injunctive Relief Class is composed of thousands of people. The Rule 23(b)(3) class exceeds 100 people.

**Common Issues Of Fact And Law Predominate And Support Certification**

197.     All of the actions complained of in this Complaint occurred at the same time and location. Defendants acted uniformly with respect each vigil attendee in that they indiscriminately used force against those in attendance.

198.     There are questions of law and fact common to the classes and they predominate over individualized questions. These common questions of fact and law include, but are not limited to:

        a.     Did Defendants unlawfully disperse the violin vigil in violation of the First, Fourth, and Fourteenth Amendments and Colorado Constitution?

b.   Did Defendants use excessive force in violation of the Fourth Amendment and Colorado Constitution in striking vigil attendees with batons, shooting them with projectiles, and deploying chemical agents?

c.   Did Defendants retaliate against vigil attendees, in part, because of their exercise of their free speech and assembly rights?

d.   Did Defendants break up the vigil through the use of force without regard to whether the individuals against whom such force was used were engaged in conduct justifying such force?

e.   Did a final policymaker for Defendant Aurora authorize Aurora Police Department Defendants, Arapahoe County Defendants, and Jefferson County Defendants' actions prior to the incident?

f.   Did Defendant Aurora ratify Aurora Police Department Defendants, Arapahoe County Defendants, and Jefferson County Defendants' action after the incident?

g.   Did Defendant Aurora cause Aurora Police Department Defendants, Arapahoe County Defendants, and Jefferson County Defendants' violation of Plaintiffs' First, Fourth, and Fourteenth Amendment, and Colorado Constitutional, rights?

h.   Are there class wide damages available?

199.   Defendants used force against the putative classes as a group and treated all similarly, acting on grounds applicable to the putative classes. The named Plaintiffs claim that the violations of their, and the classes' First, Fourth, and Fourteenth Amendment rights raise common questions of law and fact. Defendants have acted, threatened to act, and will continue to act on grounds generally applicable to the classes, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

**The Claims Of The Proposed Classes' Members Are Typical Of The Classes**

200.   Consistent with Federal Rule of Civil Procedure 23(a), the claims of the representative Plaintiffs are typical of the classes. Plaintiffs were all present at the violin vigil;

were subjected to one or more of the violations previously enumerated; and seek redress for the past violations of their rights and protection to bar the repeat of those violations in the future.

201.    Thus, Plaintiffs have the same interests and have suffered the same type of damages as the class members. Plaintiffs' claims are based upon the same or similar legal theories as the claims of the class members of each class. Each class member suffered actual damages as a result of being subjected to one or more of the violations enumerated above. The actual injuries suffered by Plaintiffs are similar in type to the actual damages suffered by each class member although the severity of those injuries may vary among class members.

202.    Consistent with Federal Rule of Civil Procedure 23(a), the representative Plaintiffs will fairly and adequately protect the interests of the class. The interests of the representative Plaintiffs are consistent with and not antagonistic to the interests of the class.

### **Plaintiffs' Counsel Will Provide Adequate Representation To The Classes**

203.    KILLMER, LANE & NEWMAN is well qualified to adequately represent the classes. KILLMER, LANE & NEWMAN has been selected as among the "Best Law Firms" by US News and World Report, both nationally and in Colorado, and its named partners, Darold Killmer, David Lane, and Mari Newman, have each been selected by Peer Recognition as among Denver's Best Lawyers. KILLMER, LANE & NEWMAN has been recognized in multiple areas by US News & World Report's Best Law Firms survey: Civil Rights Law, Litigation – First Amendment; Media & First Amendment Law; Employment Law – Individuals; and Litigation – Labor & Employment. KILLMER, LANE & NEWMAN has been recognized as Colorado's "Lawyers of the Year" by Law Week Colorado. Both as a firm and individually, the three named partners of KILLMER, LANE & NEWMAN have received repeated recognition as leaders in civil rights litigation, including the American Civil Liberties Union ("ACLU") of Colorado's 2010 Carle E.

Whitehead Civil Rights and Liberties Award for "dedication to defending civil liberties and the rule of law," the Frederick Douglass Human Rights Award by the Southern Center for Human Rights, and the 2010 Colorado Trial Lawyers Association's ("CTLA's") Access to Justice Award, honoring "perseverance, courage and character shown over and over in cases of extraordinary circumstances." KILLMER, LANE & NEWMAN has also been recognized by the Legal Aid Foundation of Colorado for its important contributions to improving access to justice in the State of Colorado, and has been consistently awarded for its outstanding contribution, service, and commitment to pro bono achievement.

204.    Not only is the firm of KILLMER, LANE & NEWMAN well-qualified to adequately represent the interests of the class, but Plaintiffs' counsel in this case, Mari Newman and Andy McNulty, have been collectively litigating civil rights claims, including the violation of the First, Fourth, and Fourteenth Amendments, for over thirty years. They have both dedicated their entire professional practice of law to representing plaintiffs in civil rights cases and cases representing the underdog.

205.    Ms. Newman has achieved excellent results for my clients in civil rights matters, including multiple seven-figure verdicts and settlements (many of which are confidential and thus cannot be listed here). *See, e.g. Estate of Marvin L. Booker, et al. v. City and County of Denver, et al.,* No. 11-cv-645-RBJ-KMT (D. Colo.) ($6,000,000 settlement following a jury verdict totaling $4,650,000); *Estate of Michael Marshall, et al. v. City and County of Denver, et al.* ($4,650,000 pre-litigation settlement, including important non-monetary consideration); *Estate of Emily Rice, et al. v. City and County of Denver, et al.*, No. 07-cv-01571-MSK-BNB (D. Colo.) ($7,000,000 settlement during litigation, including important non-monetary consideration); *Hall v. Zavaras, et al.,* Civil Action No. 08-cv-00999-DME-MEH (D. Colo.)

(combined verdict and settlement of over $1,350,000 after bench trial; settlement against the Colorado Department of Corrections also included important non-monetary consideration); *K.M. v. Hickenlooper*, Civil Action No. 17-cv-00067-PAB-CBS (D. Colo.) (settlement of $1,000,000, along with significant training and policy changes made following the filing of the case).

206.    Ms. Newman has received various honors for her civil rights work. In addition to the afore mentioned awards from the ACLU of Colorado, the Southern Center for Human Rights and the CTLA, she has been a recipient of many other awards, including the Dr. Martin Luther King Humanitarian Award from the Greater Metro Denver Ministerial Alliance, the Shorter Community AME Shoes of Justice Award honoring those who have "walked the walk of justice," the Colorado Women's Bar Association's Raising the Bar Award, the GLBT Bar Association's Attorney of the Year Award (twice), the Martin Luther King, Jr. Business Award, the Arc of Pikes Peak's Do the Right Thing Award, the Colorado Legal Initiatives Project's Barrister of the Year, and others. She has been recognized by The Best Lawyers in America® in the area of Civil Rights Law, voted among the Top 100 Lawyers and Top 50 Women Lawyers in Colorado, and repeatedly been designated as a Colorado Super Lawyer and as a Top Lawyer in the areas of Civil Rights and Employment Law by 5280 Publishing, as well as named as a Lawyer of the Year and one of seven Top Women Attorneys by Law Week Colorado.

207.    Plaintiffs' counsel, Andy McNulty, has represented clients in over fifty cases involving the First Amendment right to free speech throughout his career, with many of these cases involving the intersection of the First, Fourth, and Fourteenth Amendments. In the past few years alone, Mr. McNulty has tried multiple First Amendment cases and argued multiple others on appeal in both the Tenth Circuit and Colorado Supreme Court. He has secured significant settlements on behalf of activists, protesters, and those exercising their right to film the police.

He has given presentations on the First Amendment to lawyers and journalists, and commented as an expert on First Amendment related issues in the media.

208.    Mr. McNulty has experience litigating cases involving actions by police officers to repress the free speech rights of large groups of protesters. When Donald Trump implemented his Muslim Ban in 2017, Mr. McNulty secured a preliminary injunction under the First Amendment, allowing for protests to continue unabated at Denver International Airport. Prior to relocating to Colorado, Mr. McNulty (while working at the ACLU of Missouri) represented those protesting the murder of Michael Brown by police officer Darren Wilson in multiple cases relating to the violation of their First, Fourth, and Fourteenth Amendment rights by various law enforcement agencies. Mr. McNulty, in conjunction with a team of lawyers at the ACLU, was successful in securing a consent decree preventing police officers in Ferguson from indiscriminately using force against members of the media who were documenting the protests and a preliminary injunction allowing for protesters to continue speaking freely without threat of arrest for standing still for more than five seconds.

209.    Counsel also have experience as class counsel. Mari Newman and Andy McNulty are currently part of the team of lawyers litigating *Winston, et al. v. Polis, et al.*, on behalf of a class of Colorado Department of Corrections inmates who are vulnerable to the COVID-19 pandemic. 2020CV031823 (Colo. Dist. Ct.). Mr. McNulty is also currently litigating *Carranza, et al. v. Reams*, filed on behalf of a class of inmates at the Weld County Jail who are vulnerable to the COVID-19 pandemic. 1:20-cv-00977-PAB-SKC (D.Colo.). Mr. McNulty, with a team of lawyers, was successful in obtaining a preliminary injunction to ensure that those in the Weld County Jail are provided basic precautions against the transmission of COVID-19. Mari Newman is also currently representing plaintiffs in two putative class/collective actions on behalf

of workers seeking fair pay for their work. *Santich, et al. v. VCG, et al.,* Civil Action No. 17-cv-00631-RM-MEH (D. Colo) (representing exotic dancers); *Miles, et al. v. Ella Bliss, et al.,* Civil Action No. 18-cv-1212-PAB-MEH (D. Colo.) (representing salon workers).  Andy McNulty litigated, and ultimately was instrumental in the settlement of, a class action on behalf of Denver's homeless population. *Lyall v. Denver.* 1:16-cv-02155-WJM-SKC (D.Colo.). Additionally, while working at the ACLU of Missouri, Mr. McNulty was class counsel in *Van Orden, et al. v. Healthlink, Inc. et al.*, an action on behalf of a class of sex offenders who were confined civilly under indefinite sentences. 4:09-cv-00971-AGF (E.D. Mo.).

210.    Counsel for Plaintiffs are also well qualified to adequately represent the class in this particular action given their current and previous experience litigating multiple civil rights cases against Defendant Aurora and members of the Aurora Police Department.

211.    Ms. Newman, Mr. McNulty, and other members of their firm are currently representing other victims of Aurora's racist police brutality in the cases of *Torres v. Aurora, et al.* (involving APD officers' unlawful entry of a garage and use of excessive force against a Latinx man); and *Washington v. Aurora, et al.* (involving APD officers' unlawful arrest and use of excessive force against a Black man). Ms. Newman, Mr. McNulty, and other members of their firm have also successfully represented plaintiffs in civil rights cases against Aurora and its officers over the course of many years, including the cases of *Jamaal Bonner v. Aurora, et al.* (involving Black man killed by APD officers that settled in 2003 and resulted in significant policy changes); *Burrell v. Aurora, et al.* (involving APD's brutality against a Black man whose wife had called 911 for a medical emergency that was successfully settled in 2013); *Ravenscroft, et al. v. Aurora, et al.* (involving APD officers' unlawful entry of a garage, excessive force

against, and wrongful arrest of three young adults, along with APD's unlawful withholding of records, that was successfully settled in 2018).

212.    Counsel for the named Plaintiffs know of no conflicts among or between members of the class, the named Plaintiffs, or the attorneys in this action.

**Issues Relating To Maintenance and Superiority In This Case Support Certification**

213.    Consistent with Federal Rule of Civil Procedure 23(b)(1)(A), prosecutions of separate actions by individual members of the classes would create a risk that inconsistent or varying adjudications with respect to individual members of the class would establish incompatible standards of conduct.

214.    Consistent with Federal Rule of Civil Procedure 23(b)(1)(B), prosecutions of separate actions by individual members of the classes would create a risk of adjudications with respect to individual members of the class which would, as a practical matter, substantially impair or impede the interests of the other members of the classes to protect their interests.

215.    Consistent with Federal Rule of Civil Procedure 23(b)(2), Defendants have acted on grounds generally applicable to the classes.

216.    Consistent with Federal Rule of Civil Procedure 23(b)(3), the questions of law or fact common to the members of the classes predominate over any questions affecting only individual members, and this class action is superior to other available methods for the fair and efficient adjudication of the controversy between the parties. Named Plaintiffs are informed and believe, and allege thereon, that the interests of class members in individually controlling the prosecution of a separate action is low in that most class members would be unable to individually prosecute any action at all. Named Plaintiffs are informed and believe, and thereon allege, that the amounts at stake for individuals are such that separate suits would be

impracticable in that most members of the class will not be able to find counsel to represent them. Named Plaintiffs are informed and believe, and thereon allege, that it is desirable to concentrate all litigation in one forum because all of the claims arise in the same location, the Municipal Center in Aurora. It will promote judicial efficiency to resolve the common questions of law and fact in one forum rather than in multiple courts.

217.   Named Plaintiffs do not know the identities of most class members. Named Plaintiffs are informed and believe, and thereon allege, that a significant number of class members may be reached by the use of outreach efforts by organizations that participated in organizing the violin vigil.

218.   Named Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. The class action is superior to any other available means to resolve the issues. Liability can be determined on a class-wide basis. General damages can also be determined on a class-wide basis.

219.   Consistent with Rule 23(b)(3), class members must be furnished with the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.

220.   Pursuant to Rule 23(c)(4), particular issues are appropriate for certification because resolution of such issues would advance the disposition of the matter and the parties' interests therein.

**The Damages Caused By Defendants Support Certifying This As A Class Action**

221.   As a direct and proximate cause of the conduct described herein, the named Plaintiffs and the class members have been denied their constitutional rights as stated herein, and have suffered damages, including but not limited to, mental and emotional distress, physical

injuries and bodily harm, pain, fear, humiliation, embarrassment, discomfort, and anxiety, and other damages.

222.     Defendants' actions were done with conscious or reckless disregard for, and deliberate indifference to, Plaintiffs' and class members' rights.

223.     Plaintiffs and class members have a reasonable fear of attending protests, rallies and vigils in Aurora in the future due to the cumulative effect of the violence and misconduct by the Defendants. Without intervention by this Court, the Injunctive Relief Class members, who have participated in and wish to participate or attend protest/rally/vigil activities, particularly related to police brutality, are at risk of having their rights violated in the future due to the Defendants' demonstrated pattern of constitutional violations and threatened future actions. The Injunctive Relief Class has no adequate remedy at law to protect the future lawful exercise of their constitutional rights, and, without action by this court, will suffer irreparable injury, thereby entitling them to injunctive and declaratory relief. The Injunctive Relief Class is represented by each of the individual class representatives.

224.     Defendants have acted and refused to act on grounds generally applicable to the putative class. Injunctive and declaratory relief for the putative class as a whole is appropriate.

225.     Defendant Aurora's policies, practices, customs, conduct, and acts alleged herein resulted in, and will continue to result in, irreparable injury to the Plaintiffs, including but not limited to violation of their constitutional and statutory rights. Plaintiffs have no plain, adequate, or complete remedy at law to address the wrongs described herein. The Plaintiffs and class members intend in the future to exercise their constitutional rights of freedom of speech and association by engaging in expressive activities in the City of Aurora. Defendants' conduct

described herein has created uncertainty among Plaintiffs with respect to their exercise now and in the future of these constitutional rights, and has chilled their exercise of these rights.

226.     Specifically, Plaintiffs are concerned that they will be subjected to unreasonable and excessive force by the APD and law enforcement officers acting at the direction of the APD.

227.     Plaintiffs are also concerned that, when they are engaged in protest activities, APD will not provide adequate notice before attempting to disperse assemblies, will not provide adequate means and opportunity to disperse, and will again employ indiscriminate, unreasonable and/or excessive force that injures and terrifies protestors.

228.     Plaintiffs therefore seek injunctive relief from this court to ensure that Plaintiffs and persons similarly situated will not suffer violations of their rights from Defendants' illegal and unconstitutional policies, customs, and practices described herein.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### First Amendment Violation — Freedom Of Speech And Assembly
### (Plaintiffs, on behalf of themselves and those similarly situated, against Defendants)

229.     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

230.     Defendant law enforcement officers, along with Defendant Wilson, acted under color of state law, and within the course and scope of their employment, in their capacities as officers of the APD, ACSO, and JCSO at all times relevant to the allegations in this Complaint.

231.     Defendants are "persons" under 42 U.S.C. § 1983.

232.     Plaintiffs were engaged in First Amendment-protected expression by gathering for the violin vigil.

233.    Plaintiffs Minter and Mayes were engaged in First Amendment activity in filing this lawsuit.

234.    The actions of the Individual Defendants – specifically, the use of excessive force against peaceful vigil attendees – can be expected to chill a reasonable person from engaging in activity protected by the First Amendment.

235.    The actions of Defendant Coffman in pressuring and/or threatening Plaintiffs Minter and Mayes would chill a reasonable person from engaging in First Amendment activity.

236.    Plaintiffs' expression was on a matter of public concern and did not violate any law.

237.    Plaintiffs' expression occurred at a traditional public forum.

238.    Defendants' actions were a content-based and/or viewpoint-based restriction of Plaintiffs' expression.

239.    Defendants' actions were not a reasonable time, place, and manner restriction on speech.

240.    Defendants' actions in using the perceived political affiliations of Plaintiffs as a basis for declaring an unlawful assembly, dispersing the violin vigil, and/or using force against Plaintiffs were a content and/or viewpoint-based restriction on speech, association, and assembly.

241.    At the time when the Individual Defendants stopped Plaintiffs from speaking, expression, and gathering, Plaintiffs had a clearly established constitutional right under the First Amendment to the United States Constitution to gather, express themselves, and speak freely. Any reasonable law enforcement officer knew or should have known of this clearly established right.

242.     Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiffs' constitutional rights.

243.     Defendants stopped Plaintiffs from engaging in expressive activity in accordance with the customs, policies, and practices of Defendant Aurora.

244.     Defendant Aurora has a custom, practice or policy of tolerating violations of the First Amendment of the United States Constitution.

245.     The actions of the Individual Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Aurora.

246.     Defendant Wilson directed every action of the Individual Defendants, thereby causing the violation of Plaintiffs' rights, and was deliberately indifferent to the fact that her directives would result in the violation of Plaintiffs' rights.

247.     Defendant Aurora's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind the Individual Defendants' violation of Plaintiffs' constitutional rights.

248.     As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses.

249.     Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered during and after the vigil, and other compensatory and special damages.

250.     Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiffs of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### First Amendment Violation — Retaliation
### (Plaintiffs, on behalf of themselves and those similarly situated, against Defendants)

251.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

252.    The Individual Defendants, along with Defendant Wilson, acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

253.    Defendants are "persons" under 42 U.S.C. § 1983.

254.    Plaintiffs were engaged in First Amendment-protected expression by gathering for the violin vigil.

255.    Plaintiffs Minter and Mayes were engaged in First Amendment activity in filing this lawsuit.

256.    Plaintiffs' expression was on a matter of public concern and did not violate any law.

257.    Plaintiffs' expression occurred at a traditional public forum.

258.    The Individual Defendants jointly and on their own accord responded to Plaintiffs' First Amendment protected activity with retaliation, including but not limited to use of physical force, including chemical agents.

259.    The actions of Defendant Coffman in pressuring and/or threatening Plaintiffs Minter and Mayes would chill a reasonable person from engaging in First Amendment activity and were based on Plaintiffs Minter and Mayes' First Amendment activity.

260.    Defendants' actions in using the perceived political affiliations of Plaintiffs as a basis for declaring an unlawful assembly, dispersing the violin vigil, and/or using force against

58

Plaintiffs were a content and/or viewpoint-based restriction on speech, association, and assembly.

261.    By unlawfully using force against Plaintiffs, the Individual Defendants sought to punish Plaintiffs for exercising their First Amendment rights, to silence them, and to deter them from gathering and speaking in the future. The Individual Defendants' retaliatory actions would chill a person of ordinary firmness from engaging in such First Amendment protected activity.

262.    The Individual Defendants' retaliatory actions were substantially motivated by Plaintiffs' exercise of their First Amendment rights.

263.    At the time when the Individual Defendants retaliated against Plaintiffs for exercising their First Amendment rights, Plaintiffs had a clearly established constitutional right under the First Amendment to the United States Constitution to be free from retaliation. Any reasonable law enforcement officer knew or should have known of this clearly established right.

264.    Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiffs' constitutional rights.

265.    Defendants stopped Plaintiffs from engaging in expressive activity in accordance with the customs, policies, and practices of Defendant Aurora.

266.    Defendant Aurora has a custom, practice or policy of tolerating its officers' retaliatory violations of the First Amendment of the United States Constitution.

267.    The actions of the Individual Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Aurora.

268.    Defendant Wilson directed every action of the Individual Defendants, thereby causing the violation of Plaintiffs' rights, and was deliberately indifferent to the fact that her directives would result in the violation of Plaintiffs' rights.

269.     Defendant Aurora's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind the Individual Defendants' violation of Plaintiffs' constitutional rights.

270.     As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses.

271.     Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered during and after the vigil, and other compensatory and special damages.

272.     Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiffs of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourth Amendment Violation — Excessive Force**
**(Plaintiffs Minter, Mallory, Sprague, Acker, Fisher, and Hopp on behalf of themselves and those similarly situated, against Defendants, except Defendant Coffman)**

273.     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

274.     The Individual Defendants, along with Defendant Wilson, acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

275.     Defendants are "persons" under 42 U.S.C. § 1983.

276.     Plaintiffs had a protected Fourth Amendment interest against being victimized by the use of excessive force at the hands of law enforcement personnel.

277.    The Individual Defendants did not have, at any time, a legally valid basis to seize Plaintiffs.

278.    The Individual Defendants unlawfully seized Plaintiffs by means of excessive physical force, including the use of chemical agents.

279.    The Individual Defendants had no warrant authorizing any seizure of Plaintiffs.

280.    Each of the Individual Defendants failed to intervene to prevent the other Defendants from violating Plaintiffs' constitutional rights, and is thereby liable for such failure to intervene.

281.    Defendants' actions were objectively unreasonable in light of the circumstances confronting them.

282.    Plaintiffs had committed no crime (nor could any of the Defendants have reasonably believed they had committed any crime) that would legally justify arrest or detention, Plaintiffs gave the officers no reason to fear for their safety, Plaintiffs were obviously unarmed, and Plaintiffs were not resisting arrest or fleeing.

283.    The Individual Defendants did not have a legally valid basis to seize Plaintiffs in the manner and with the level of force used under the circumstances presented.

284.    Defendants recklessly created the situation in which they used force.

285.    Defendants' actions, as described herein, were objectively unreasonable in light of the facts and circumstances confronting them.

286.    At the time when the Individual Defendants used excessive force against Plaintiffs, Plaintiffs had a clearly established constitutional right under the Fourth Amendment to the United States Constitution to be secure from unreasonable seizure through excessive force.

Any reasonable law enforcement officer knew or should have known of this clearly established right.

287.    Defendants engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiffs' constitutionally-protected rights.

288.    Defendant Aurora has a custom, practice or policy of tolerating violations of the Fourth Amendment of the United States Constitution.

289.    The actions of the Individual Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Aurora.

290.    Defendant Wilson directed every action of the Individual Defendants, thereby causing the violation of Plaintiffs' rights, and was deliberately indifferent to the fact that her directives would result in the violation of Plaintiffs' rights.

291.    Defendant Aurora's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind the Individual Defendants' violation of Plaintiffs' constitutional rights.

292.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described herein, Plaintiffs suffered injuries, damages, and losses.

293.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered during and after the vigil, and other compensatory and special damages.

294.    Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiffs of due process and of rights, privileges, liberties, and immunities secured by

the Constitution of the United States of America.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourteenth Amendment Violation — Excessive Force**
**(Plaintiffs Minter, Mallory, Sprague, Acker, Fisher, and Hopp on behalf of themselves and those similarly situated, against Defendants, except Defendant Coffman)**

295.     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

296.     The Individual Defendants, along with Defendant Wilson, acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

297.     Defendants are "persons" under 42 U.S.C. § 1983.

298.     Plaintiffs had a protected Fourteenth Amendment Substantive Due Process interest against being unreasonably harmed by the use of excessive force at the hands of law enforcement personnel.

299.     The Individual Defendants did not have, at any time, a legally valid basis to use force against Plaintiffs.

300.     The Individual Defendants' use of force was extremely disproportionate.

301.     Defendants acted with malice and/or excessive zeal amounting to an abuse of power.

302.     Defendants acted for the purpose of causing harm unrelated and unnecessary to any relevant policing objective.

303.     Defendants' actions were arbitrary and/or conscience shocking in light of the circumstances confronting them.

304.    Defendants engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiffs' constitutionally-protected rights.

305.    At the time when the Individual Defendants used excessive force against Plaintiffs, Plaintiffs had a clearly established constitutional right under the Fourteenth Amendment to the United States Constitution to be secure from excessive force. Any reasonable law enforcement officer knew or should have known of this clearly established right.

306.    The actions of the Individual Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Aurora.

307.    Defendant Wilson directed every action of the Individual Defendants, thereby causing the violation of Plaintiffs' rights, and was deliberately indifferent to the fact that her directives would result in the violation of Plaintiffs' rights.

308.    Defendant Aurora's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind the Individual Defendants' violation of Plaintiffs' constitutional rights.

309.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses.

310.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered during and after the vigil, and other compensatory and special damages.

**FIFTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourteenth Amendment Violation — Due Process**

**(Plaintiffs, on behalf of themselves and those similarly situated, against Defendants, except Defendant Coffman)**

311.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

312.    The Individual Defendants, along with Defendant Wilson, acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

313.    Defendants are "persons" under 42 U.S.C. § 1983.

314.    The orders issued by Defendant Wilson and the Individual Defendants, and the authority on which those orders were based, were vague and not clearly defined.

315.    The orders issued by Defendant Wilson and the Individual Defendants, and the authority on which those orders were based, offered no clear and measurable standard by which Plaintiffs and others could act lawfully.

316.    Defendant Wilson and the Individual Defendants lacked legal authority, through Aurora municipal ordinance, state law, or otherwise, to order the dispersal of Plaintiffs and, thereby, there were no explicit standards to govern the order of dispersal or limits on law enforcement's authority to order dispersal.

317.    The orders issued by Defendant Wilson and the Individual Defendants, and the authority on which those orders were based, failed to provide people of ordinary intelligence a reasonable opportunity to understand what conduct they prohibited, and authorized or encouraged arbitrary and discriminatory enforcement, or both.

318.    At the time when Defendant Wilson and the Individual Defendants violated Plaintiffs' due process rights, Plaintiffs had a clearly established constitutional right under the

Fourteenth Amendment to the United States Constitution to be afforded due process of law. Any reasonable law enforcement officer knew or should have known of this clearly established right.

319.    Defendants engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiffs' constitutionally-protected rights.

320.    The actions of the Individual Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Aurora.

321.    Defendant Wilson directed every action of the Individual Defendants, thereby causing the violation of Plaintiffs' rights, and was deliberately indifferent to the fact that her directives would result in the violation of Plaintiffs' rights.

322.    Defendant Aurora's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind the Individual Defendants' violation of Plaintiffs' constitutional rights.

323.    Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiffs of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

324.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered during and after the vigil, and other compensatory and special damages.

**SIXTH CLAIM FOR RELIEF**
**C.R.S. § 13-21-131**
**Colo. Const. Art. II, Section 10 — Freedom Of Speech**
**(Plaintiffs, on behalf of themselves and those similarly situated,**
**against APD Defendants, ACSO Defendants, JCSO Defendants, and Defendant Wilson)**

325.     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

326.     The Individual Defendants, along with Defendant Wilson, acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

327.     The Individual Defendants, along with Defendant Wilson, are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

328.     The Free Speech Clause to the Colorado Constitution provides that "[n]o law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty; and in all suits and prosecutions for libel the truth thereof may be given in evidence, and the jury, under the direction of the court, shall determine the law and the fact." Colo. Const. Art. II, Section 10.

329.     The free speech rights protected by Colo. Const. Art. II, Section 10 are more expansive than those protected by the First Amendment to the United States Constitution.

330.     Plaintiffs were engaged in free speech activity by gathering for the violin vigil.

331.     The actions of the Individual Defendants – specifically, the use of excessive force against peaceful vigil attendees – can be expected to chill a reasonable person from engaging in activity protected by Colo. Const. Art. II, Section 10.

332.     Plaintiffs' expression was on a matter of public concern and did not violate any law.

333.     Plaintiffs' expression occurred at a traditional public forum.

334.     Defendants' actions were a content-based and/or viewpoint-based restriction of Plaintiffs' expression.

335.     Defendants' actions in using the perceived political affiliations of Plaintiffs as a basis for declaring an unlawful assembly, dispersing the violin vigil, and/or using force against Plaintiffs were a content and/or viewpoint-based restriction on speech, association, and assembly.

336.     Defendants' actions were not a reasonable time, place, and manner restriction on speech.

337.     Defendants jointly and on their own accord responded to Plaintiffs' Colo. Const. Art. II, Section 10 protected activity with retaliation, including but not limited to use of physical force.

338.     By unlawfully using force against Plaintiffs, Defendants sought to punish Plaintiffs for exercising their Colo. Const. Art. II, Section 10 rights, to silence them, and to deter them from gathering and speaking in the future. Defendants' retaliatory actions would chill a person of ordinary firmness from engaging in such Colo. Const. Art. II, Section 10 protected activity.

339.     Defendants' retaliatory actions were substantially motivated by Plaintiffs' exercise of their Colo. Const. Art. II, Section 10 rights.

340.     Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's Colo. Const. Art. II, Section 10 rights.

341.     Defendant Wilson directed every action of the Individual Defendants, thereby causing the violation of Plaintiffs' rights, and was deliberately indifferent to the fact that her directives would result in the violation of Plaintiffs' rights.

342.     As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses.

343.     Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered during and after the vigil, and other compensatory and special damages.

## SEVENTH CLAIM FOR RELIEF
### C.R.S. § 13-21-131
### Colo. Const. Art. II, Section 24 — Right To Assemble And Petition
### (Plaintiffs, on behalf of themselves and those similarly situated,
### against APD Defendants, ACSO Defendants, JCSO Defendants, and Defendant Wilson)

344.     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

345.     The Individual Defendants, along with Defendant Wilson, acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

346.     The Individual Defendants, along with Defendant Wilson, are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

347.     The Assembly and Petition Clause to the Colorado Constitution provides that "[t]he people have the right peaceably to assemble for the common good, and to apply to those

invested with the powers of government for redress of grievances, by petition or remonstrance." Colo. Const. Art. II, Section 24.

348.    The rights protected by Colo. Const. Art. II, Section 24 are more expansive than those protected by the First Amendment to the United States Constitution.

349.    Plaintiffs were engaged in assembly and petitioning activity by gathering for the violin vigil.

350.    Defendants' actions in using the perceived political affiliations of Plaintiffs as a basis for declaring an unlawful assembly, dispersing the violin vigil, and/or using force against Plaintiffs were a content and/or viewpoint-based restriction on speech, association, and assembly.

351.    The actions of the Individual Defendants – specifically, the use of excessive force against peaceful vigil attendees – can be expected to chill a reasonable person from engaging in activity protected by Colo. Const. Art. II, Section 24.

352.    Plaintiffs' expression was on a matter of public concern and did not violate any law.

353.    Plaintiffs' expression occurred at a traditional public forum.

354.    Defendants' actions were a content-based and/or viewpoint-based restriction of Plaintiffs' expression.

355.    Defendants' actions were not a reasonable time, place, and manner restriction.

356.    Defendants jointly and on their own accord responded to Plaintiffs' Colo. Const. Art. II, Section 24 protected activity with retaliation, including but not limited to use of physical force.

357.    By unlawfully using force against Plaintiffs, the Individual Defendants sought to punish Plaintiffs for exercising their Colo. Const. Art. II, Section 24 rights, to silence them, and to deter them from gathering and speaking in the future. Defendants' retaliatory actions would chill a person of ordinary firmness from engaging in such Colo. Const. Art. II, Section 24 protected activity.

358.    Defendants' retaliatory actions were substantially motivated by Plaintiffs' exercise of their Colo. Const. Art. II, Section 24 rights.

359.    Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiffs' Colo. Const. Art. II, Section 24 rights.

360.    Defendant Wilson directed every action of the Individual Defendants, thereby causing the violation of Plaintiffs' rights, and was deliberately indifferent to the fact that her directives would result in the violation of Plaintiffs' rights.

361.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses.

362.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered during and after the vigil, and other compensatory and special damages.

### EIGHTH CLAIM FOR RELIEF
### C.R.S. § 13-21-131
### Colo. Const. Art. II, Section 7 — Excessive Force
**(Plaintiffs Minter, Mallory, Sprague, Acker, Fisher, and Hopp on behalf of themselves and those similarly situated, against APD Defendants, ACSO Defendants, JCSO Defendants, and Defendant Wilson)**

363.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

364.    The Individual Defendants, along with Defendant Wilson, acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

365.    The Individual Defendants, along with Defendant Wilson, are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

366.    Plaintiffs had a protected interest under Colo. Const. Art. II, Section 7 against being victimized by the use of excessive force at the hands of law enforcement personnel.

367.    The Individual Defendants did not have, at any time, a legally valid basis to seize Plaintiffs.

368.    The Individual Defendants unlawfully seized Plaintiffs by means of excessive physical force.

369.    The Individual Defendants had no warrant authorizing any seizure of Plaintiffs.

370.    Each of the Individual Defendants failed to intervene to prevent the other Defendants from violating Plaintiffs constitutional rights, and is thereby liable for such failure to intervene.

371.    Defendants' actions were objectively unreasonable in light of the circumstances confronting them

372.    Plaintiffs had committed no crime (nor could any Defendant have reasonably believed they had committed any crime) that would legally justify a arrest or detention, Plaintiffs

gave the officers no reason to fear for their safety, Plaintiffs were obviously unarmed, and Plaintiffs were not resisting arrest or fleeing.

373.     Defendants did not have a legally valid basis to seize Plaintiffs in the manner and with the level of force used under the circumstances presented.

374.     Defendants recklessly created the situation in which they used force.

375.     Defendants' actions, as described herein, were objectively unreasonable in light of the facts and circumstances confronting them.

376.     Defendants engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiffs' constitutionally-protected rights.

377.     Defendant Wilson directed every action of the Individual Defendants, thereby causing the violation of Plaintiffs' rights, and was deliberately indifferent to the fact that her directives would result in the violation of Plaintiffs' rights.

378.     As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses.

379.     Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered during and after the vigil, and other compensatory and special damages.

### NINTH CLAIM FOR RELIEF
### C.R.S. § 13-21-131
### Colo. Const. Art. II, Section 25 — Excessive Force
**(Plaintiffs Minter, Mallory, Sprague, Acker, Fisher, and Hopp on behalf of themselves and those similarly situated, against APD Defendants, ACSO Defendants, JCSO Defendants, and Defendant Wilson)**

380.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

381.    The Individual Defendants, along with Defendant Wilson, acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

382.    The Individual Defendants, along with Defendant Wilson, are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

383.    Plaintiffs had a protected Colo. Const. Art. II, Section 25 interest against being unreasonably harmed by the use of excessive force at the hands of law enforcement personnel.

384.    The Individual Defendants did not have, at any time, a legally valid basis to use force against Plaintiffs.

385.    The Individual Defendants' use of force was extremely disproportionate.

386.    Defendants acted with malice and/or excessive zeal amounting to an abuse of power.

387.    Defendants acted for the purpose of causing harm unrelated and unnecessary to any relevant policing objective Plaintiffs.

388.    Defendants' actions were arbitrary and/or conscience shocking in light of the circumstances confronting them.

389.    Defendants engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiffs' constitutionally-protected rights.

390.    Defendant Wilson directed every action of the Individual Defendants, thereby causing the violation of Plaintiffs' rights, and was deliberately indifferent to the fact that her directives would result in the violation of Plaintiffs' rights.

391.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses.

392.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered during and after the vigil, and other compensatory and special damages.

**TENTH CLAIM FOR RELIEF**
**C.R.S. § 13-21-131**
**Colo. Const. Art. II, Section 25 — Due Process**
**(Plaintiffs, on behalf of themselves and those similarly situated,**
**against APD Defendants, ACSO Defendants, JCSO Defendants, and Defendant Wilson)**

393.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

394.    The Individual Defendants, along with Defendant Wilson, acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

395.    The Individual Defendants, along with Defendant Wilson, are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

396.    Plaintiffs had a protected Colo. Const. Art. II, Section 25 interest against deprivation of life, liberty, or property without due process of law.

397.    The orders issued by Defendant Wilson and the Individual Defendants, and the authority on which those orders were based, was vague and not clearly defined.

398.    The orders issued by Defendant Wilson and the Individual Defendants, and the authority on which those orders were based, offered no clear and measurable standard by which Plaintiffs and others could act lawfully.

399.    Defendants lacked legal authority, through Aurora municipal ordinance, state law, or otherwise, to order the dispersal of Plaintiffs and, thereby, there were no explicit standards to govern the order of dispersal or limits on law enforcement's authority to order dispersal.

400.    The orders issued by Defendant Wilson and the Individual Defendants, and the authority on which those orders were based, failed to provide people of ordinary intelligence a reasonable opportunity to understand what conduct they prohibited, and authorized or encouraged arbitrary and discriminatory enforcement, or both.

401.    Defendants engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiffs' constitutionally-protected rights.

402.    Defendant Wilson directed every action of the Individual Defendants, thereby causing the violation of Plaintiffs' rights, and was deliberately indifferent to the fact that her directives would result in the violation of Plaintiffs' rights.

403.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses.

404.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs

suffered during and after the vigil, and other compensatory and special damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and others similarly situated, respectfully request that this Court enter judgment in their favor and against each of the Defendants, and award them all relief allowed by law, including but not limited to the following:

A.    All appropriate relief at law and equity;

B.    An order certifying each class defined herein pursuant to the Federal Rules of civil Procedure 23(b)(2) and (3);

C.    An order appointing the named Plaintiffs as class representatives and their undersigned counsel as class counsel;

D.    Injunctive relief, including:

    a.  Enjoining Defendants from using chemical agents, including pepper spray, against those exercising their rights of free speech and assembly;

    b.  Enjoining Defendants from shooting projectiles indiscriminately into crowds of those exercising their rights of free speech and assembly;

    c.  Requiring all Defendant law enforcement officers deployed to police demonstrations must have their body-worn cameras recording at all times, and forbidding officers from intentionally obstructing the camera or recording;

    d.  Any and all orders to disperse must only be given when there is imminent danger of harm to persons (not property);

    e.  Any and all orders to disperse must be followed by adequate time for the intended audience to comply, and officers must leave room for safe egress; if it appears the intended audience did not hear the order, the order must be repeated multiple times before the crowd is dispersed.

E.    Declaratory relief and other appropriate equitable relief;

F.    Economic losses on all claims as allowed by law;

G.      Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

H.      Punitive damages on all claims allowed by law and in an amount to be determined at trial;

I.      Attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988 and C.R.S. § 13-21-131, including expert witness fees, on all claims allowed by law;

J.      Pre-and post-judgment interest at the lawful rate; and

K.      Any other appropriate relief at law and equity that this Court deems just and proper.

**PLAINTIFFS HEREBY DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE**

DATED this 12th day of October 2020.

KILLMER, LANE & NEWMAN, LLP

*/s/ Andy McNulty*
Mari Newman
Andy McNulty
Helen Oh
1543 Champa St., Ste. 400
Denver, CO 80202
Phone: (303) 571-1000
Facsimile: (303) 571-1001
mnewman@kln-law.com
amcnulty@kln-law.com
hoh@kln-law.com

ATTORNEYS FOR PLAINTIFFS